Danny **WRIGHT**, Appellant,

v.

**STATE** of Alaska, Appellee.

No. 1288.

Supreme Court of Alaska.

Oct. 6, 1972.

Victor D. Carlson, and Herbert D. Soll, Public Defenders, Anchorage, Barry J. Rovins, Ketchikan, R. Collin Middleton, Asst. Public Defenders, Anchorage, for appellant.

John E. Havelock, Atty. Gen., Juneau, W. H. Hawley, Dist. Atty., Ketchikan, for appellee.

## OPINION

Before BONEY, C. J., and RABINO-WITZ, CONNOR and ERWIN, JJ.

BONEY, Chief Justice.

The defendant, Wright, appeals from a conviction and six-year sentence for selling LSD.[1]

On March 5, 1970, Wright pleaded not guilty to a charge of selling LSD to one Fred Lee Williams in Ketchikan on or about December 19, 1969.[2] At that time, trial was set to commence on March 23. On March 16, Wright, through his appointed counsel, moved to continue the date of his trial for at least a month beyond the date set, as the additional time was required for sufficient preparation for trial.

At the hearing on the motion, Wright's attorney contended that a continuance was necessary because he was encountering difficulties in gathering information on the alleged crimes. Specifically, he argued that because of the seriousness of the charges and the likelihood that the prosecution's case would center around the testimony of Williams, an apparent police informer, a thorough investigation of Williams' background and contacts with the police was necessary. He further stated that he had not been able to obtain a list of other police witnesses, and that consequently he would have to locate and question individuals who might prove useful to the defense. He also asserted that he would need the services of an investigator and that he had only recently received notice that the Public Defender Agency, by whom he had been hired to represent Wright, would reimburse him for any expenses incurred in hiring one. Finally, he urged that a continuance was necessary because the defense was contemplating psychological tests for Wright.

The state opposed the motion for continuance arguing that, while it had refused to give out information in its files, it was not required to do so by law. The prosecuting attorney claimed that he had of-

1. A violation of AS 17.12.010.

2. Wright also pleaded not guilty to a charge of selling opium to Williams on or about November 13, 1969, in violation of AS 17.10.010. A motion for judgment of acquittal of the opium charge was granted at trial after Williams testified he had smoked the evidence prior to reporting the sale to the police.

fered to consent to a bill of particulars, but that none had been requested by the defense. The state further contended that Wright's attorney could have hired an investigator prior to being assured of reimbursement, and that the defense had taken no steps to procure a court order for psychiatric testing.[3] Thus while attempting to meet the arguments of the defense, the state offered no reason why the March 23rd trial date was particularly desirable.

The superior court denied the motion for continuance, stating that the defense had failed to present any persuasive grounds for continuance. The court specifically discounted the argument that an investigation of Williams' background was essential, apparently on the theory that any information unearthed would be inadmissible at trial since it would constitute specific acts of misconduct.

The case proceeded to trial as scheduled on March 23, 1970. After a jury had been selected and sworn, the defense renewed its motion for a continuance. The motion was summarily denied. Defense counsel then moved to strike the indictment on the ground that the grand jury which had issued the indictment was comprised of Juneau, rather than Ketchikan, residents. The state opposed the motion, arguing that under Alaska Rule of Criminal Procedure 12(b), such a motion must be made prior to trial. The court denied the motion, ruling it untimely.

The state then began its case. As the state called its second witness, Fred Lee Williams to the stand, defense counsel submitted a motion for an order requiring Williams to be examined by a qualified psychologist to determine his competency to testify as a witness for the state. This motion was accompanied by an affidavit of Wright's attorney, stating on the basis of information and belief that Williams was a user of narcotics and hallucinogenic drugs, that he had recently admitted using LSD, and that he had used drugs since the date of the crime alleged in the indictment

against Wright. After some discussion, the court continued hearing on the motion until the following morning and recessed for the day. No disposition of the motion appears on the record, but from subsequent events we infer that the motion was denied.

On the second day of trial, the state resumed its case in chief. The core of the state's case was the testimony of Fred Lee Williams. In substance, Williams testified that he had been requested and had agreed to assist the Ketchikan Police in investigating illicit drug transactions. He stated that on December 19, 1969, he had made arrangements to buy three LSD tablets from Wright; he contacted the police, who furnished him with $12.00 necessary to make the buy ($4.00 per tablet). Williams claimed that he subsequently met with Wright, that both of them went to an apartment where several other individuals were already present, and that Wright got three pills from a refrigerator in the apartment and consummated the transaction. According to Williams' version, he then, at the request of Wright, broke off a third of one of the tablets and swallowed it. Shortly thereafter, Williams supposedly left the apartment, took a bus to the center of town, and contacted the police by telephone. The police, according to Williams, told him to report immediately to the station. He complied with the request, surrendering the remaining two and two-thirds tablets to the police upon his arrival at the station.

In support of Williams' testimony concerning the alleged LSD sale, the state produced three witnesses, including Charles Samuelson. On direct examination, Samuelson testified that prior to the time of trial he had talked to both Captain Bellon and Officer Burnham of the Ketchikan Police Department. He stated that he had not given a written statement to either officer. He also stated that he had recently spoken with the district attorney concerning his knowledge of the events relating to the sale of LSD by Wright to Williams.

---

3. The defense never formally sought to have the defendant examined.

Samuelson testified as to events both on the evening of the alleged sale of LSD by Wright to Williams and on the day before when he and another person had met Wright at the ferry terminal. While generally cooperative, Samuelson balked at the questioning three times. At each such juncture, the district attorney prompted him with references to prior statements:

Do you remember telling me last night that they [Wright and Williams] were talking about acid?

. . . . . .

Didn't you tell me yesterday that he [Wright] was going to sell this acid and go to Hawaii?

. . . . . .

Didn't you state to me yesterday that Danny Wright brought this acid up from Seattle?

Following Samuelson's direct examination, defense counsel requested the court to order production of notes taken during the district attorney's interview with Samuelson on the night before trial. The district attorney claimed that, while he did take some notes of the conversation, he considered those to be his own personal notes rather than statements of Samuelson. Defense counsel objected, requesting that the notes be produced, or, in the alternative, that the testimony of Samuelson be stricken. The court denied the motion to produce without further inquiry, declaring:

Well, he's [the district attorney has] stated that he has no notes or statements from the defendant and he's made no report such as an officer's report.

Shortly after this motion to produce was denied, defense counsel learned from Samuelson that in a previous interview police Captain Bellon had taken notes as Samuelson spoke. A request was made for an order requiring the state to produce Captain Bellon's notes. The district attorney stated that he did not know the whereabouts of the notes, and hinted that Captain Bellon was unavailable to assist in finding them. Again the court ruled

against defense counsel, this time holding that defense counsel would not be entitled to the notes which Captain Bellon took from Samuelson's interview until Captain Bellon had testified.

The state also called John D. Kirk, a Bureau of Narcotics and Drugs (B.N.D.D.) chemist who had performed tests on the pills in question. He identified the pills as LSD. He further provided testimony as to the handling of the pills upon their receipt by the B.N.D.D. Officer James K. Rockman of the Ketchikan Police testified concerning the handling of the LSD after it was returned to Ketchikan by the B.N.D.D. Finally, Officer Jerry Burnham of the Ketchikan Police testified concerning the arrangements which the police had made with Williams for the purchase of the LSD in question. He further provided testimony as to the handling of the pills from the time that they were delivered to the police by Williams to the time when they were mailed to the B.N.D.D.

The defense, for its case, relied principally upon cross-examination of the state's witnesses and upon the testimony of John Bakken. Bakken claimed to have been present during the sale of the LSD in question. According to Bakken, LSD was given to Williams not by Wright, but by an individual named Dave Tillson. Bakken testified that Wright had been at the apartment in question, but that he had left prior to the time when the LSD was given to Williams.

The jury apparently believed the state's witnesses; on March 26 a verdict of guilty was returned. On April 10, following a hearing, the superior court entered judgment and sentenced Wright to six years imprisonment. The Public Defender Agency then replaced counsel for Wright, and this appeal was brought.

██ At the outset, Wright argues that the trial court abused its discretion and committed reversible error in denying his motions for continuance. The granting of a motion for continuance is within the dis-

cretion of the trial court; reversal is appropriate only upon the showing of an abuse of that discretion.[4] The question of abuse of discretion depends upon the particular facts and circumstances of each case.[5]

█ There appears to be no suspicion that Wright, in requesting continuance, was merely stalling. His claim was not that his counsel had not been able to use the time he had already been given, but rather that even if he used the entire time allotted he would not be sufficiently prepared for trial. Moreover, the state has failed to present an argument for the necessity of holding the trial on March 23, the date originally set.[6] Furthermore, the trial court's ruling denying the motion for continuance was predicated upon an evidently erroneous impression of applicable law. In effect, the court held that a continuance was unnecessary because it was not important for the defense to investigate the background and involvement of Williams. The court felt that such investigation was unimportant because it thought that any information which was gathered would constitute information as to specific acts of misconduct, and that such acts would be inadmissible at trial. The belief of the court is simply incorrect, since such information, if discovered, would have been properly admissible to show bias.[7]

█ However, a showing of error alone is not enough: before a conviction will be reversed for failure to grant a continuance, the denial must appear prejudicial to the defense.[8] While we have held the circumstances surrounding the denial may give rise to a presumption of prejudice,[9] the circumstances of the present case neither compel such a presumption nor indicate any prejudice. The defense was ultimately able to hire an investigator, and was further able, shortly before trial, to interview, at least briefly, the principal state witnesses. In Love v. State [10] we adopted, for cases involving errors not based on constitutional claims, a test for harmless error which focuses on whether or not the judgment was substantially affected by the error. We are impressed that defense counsel was reasonably well prepared and that he was able to cross-examine effectively. We therefore conclude that any error in denying the requested continuance did not substantially affect the judgment and we hold any such error to be harmless.

█ Wright next argues that the trial court erred in denying his motion to dismiss his indictment on the basis that it had been issued by a grand jury composed entirely of Juneau, rather than Ketchikan, residents. Alaska Rule of Criminal Procedure 12(b)(2) provides in pertinent part:

Defenses and objections based on defects in the institution of the prosecution or in the indictment or information other than that it fails to show jurisdiction in the court or to charge an offense may be raised only by motion *before* trial. . . Failure to present any such defense or

4. Doe v. State, 487 P.2d 47, 57 (Alaska 1971); Klockenbrink v. State, 472 P.2d 958, 964 (Alaska 1970); Mead v. State, 445 P.2d 229, 230–231 (Alaska 1968); Gregoire v. National Bank of Alaska, 413 P.2d 27, 33 (Alaska 1966).

5. Doe v. State, 487 P.2d 47, 57 (Alaska 1971); Klockenbrink v. State, 472 P.2d 958, 964 (Alaska 1970); Mead v. State, 445 P.2d 229, 232 (Alaska 1968).

6. *See* Klockenbrink v. State, 472 P.2d 958, 963 (Alaska 1970), *cf.* McKay v. State, 489 P.2d 145, 150–151 (1971).

7. Whitton v. State, 479 P.2d 302, 316–318 (Alaska 1970). During the course of Wright's trial, the superior court was consistent with its views expressed prior to trial. The court held that the defense was precluded from inquiring into specific circumstances involved in a previous incident which had resulted in the arrest of Williams. The court's ruling, erroneous under the *Whitton* holding, has not been raised in this appeal.

8. Doe v. State, 487 P.2d 47, 57 (Alaska 1971); Klockenbrink v. State, 472 P.2d 958, 964 (Alaska 1970).

9. Doe v. State, 487 P.2d 47, 57 (Alaska 1971).

10. 457 P.2d 622, 630–632 (Alaska 1969).

objections constitutes a waiver thereof, but the court for cause shown may grant relief from the waiver. (Emphasis added.)

Under Rule 12(b)(2), the defense motion was untimely: it was presented after the jury had been selected and sworn; it was based upon the composition of the grand jury and thus did not charge that the indictment failed to show jurisdiction in the court. Moreover, defense counsel offered no explanation for the failure to raise the motion during the time between Wright's arraignment and his trial. The trial court's refusal to grant the motion was fully justified.

█ Wright next asserts that the trial court erred either in denying his motion for a psychiatric examination of the chief prosecution witness, Fred Lee Williams, or, alternatively, in failing to conduct a preliminary inquiry out of the presence of the jury into the competency of said witness. The motion was accompanied by a very short memorandum of law and by the affidavit of a clinical psychologist from Washington. The affidavit essentially stated that drug use could substantially impair capacity to testify in a number of ways, and that testing by a clinical psychologist could assist in determining the level of intellectual functioning, extent of intellectual impairment, and other emotional, judgmental, and motivational characteristics of a prospective witness. However, the affiant was careful to state that his opinions

were "of a general nature and not derived from the facts pertaining to any specific individual."

By not presenting any assertions tending to negate the competency of the specific witness in question,[11] Fred Lee Williams, Wright failed to overcome the presumption of competency in which our courts indulge.[12] We therefore hold that the trial court did not err in denying Wright's motion.[13]

Turning now to the testimony of Charles Samuelson, Wright argues that the district attorney exceeded permissible bounds in interrogating Samuelson. While ultimately his claim of error is addressed to the totality of the direct examination, he specifically argues that the three references to prior statements of the witness were improper under relevant Alaska law governing impeachment by prior inconsistent statements. This argument is founded on the assertion that the district attorney was interested not in impeachment but in admitting into evidence the substance of what Samuelson had related to him the previous night. Alternatively, if the use of the statements constituted permissible impeachment, Wright states that he was at least entitled to an instruction limiting their use to impeachment purposes.

If not admissible for impeachment purposes, Samuelson's prior statements to the district attorney would be inadmissible hearsay.[14]

11. Alaska R.Civ.P. 43(g)(1), made applicable to criminal cases by Alaska R. Crim.P. 26(a), provides the grounds upon which a person may be disqualified as a witness. Those grounds go specifically to the ability of the person both to express himself and to understand his obligation to tell the truth.

12. Cf. Flores v. State, 443 P.2d 73, 77–78 (Alaska 1968).

13. The state has contended that this argument has been abandoned by reason of Wright's failure to include the alternative error in his Points on Appeal. Wright, in his reply brief, argues that the real issue is whether the trial court erred

in allowing the testimony without some determination of Williams' competency. Given our disposition of the matter, we need not reach the argument that the point has been abandoned.

14. McCormick confirms the view that prior inconsistent statements, if used as substantive evidence of the facts which they assert, are hearsay:

The reason for the orthodox view that a previous statement of the witness, though admissible to impeach, is not evidence of the fact stated, is clear and obvious. When used for that purpose the statement is hearsay. Its value rests on the credit of the declarant, who

In Beavers v. State [15] we discussed at length both the admissibility and the use of prior inconsistent statements. We reaffirmed our adherence to the requirements of Alaska Rule of Civil Procedure 43(g)(11)[c] [16] which allows a party to impeach his own witness with prior inconsistent statements as follows:

A witness may be impeached by evidence that he has made at other times statements inconsistent with his present testimony. The statements must first be related to him, with the circumstances of times, places, and persons present, and the witness shall be asked whether he has made such statements and if so, shall be allowed to explain them. If the statements are in writing, they shall be shown to the witness before he is asked any question concerning them.

We also held in *Beavers* that prior inconsistent statements may be used as substantive evidence of the matters alleged and that the trial court's allowed use of such statements will be upheld barring abuse of discretion.[17]

We must therefore examine the transcript to determine if each of the prior inconsistent statements was properly introduced and used. The interrogation of Samuelson by the district attorney progressed as follows:

Q. Okay. But what happened before— at the time that they left?

A. Well. . . .

Q. Did something happen right behind you?

A. It could have. I didn't see anything happen behind me but it could have.

Q. Did you hear—did you hear any conversation?

A. No, not that I can remember. (Pause of 10 seconds)

Q. Were they talking about anything when they [Wright and Williams] came in the apartment?

A. I don't remember.

Q. Do you remember telling me last night that they were talking about acid?

A. Yeah.

Q. When was that?

A. At the apartment.

.  .  .  .  .  .

Q. Okay. And did the defendant tell you his [Wright's] plans, what he was going to do in the imed—immediate future?

A. No sir, he didn't.

Q. Didn't you tell me yesterday that he [Wright] was going to sell this acid and go to Hawaii?

A. (Indiscernible—interrupted) . . .

[Defense Counsel] I object, Your Honor, again on the same grounds. I think he's—we have no evidence that he made a prior inconsistent statement. If there's a statement I would be glad to see it but I think he has to lay a foundation.

[District Attorney] I can to refresh [sic] his recollection on it.

THE COURT: Overruled.

Q. Didn't you tell me that yesterday?

A. Yes, I did.

Q. And did the defendant make that statement?

A. Not in that order, he didn't.

Q. Okay. How did he say it?

A. Well, I can't remember.

Q. Well, what did he say substantially?

A. That he wanted to go to Hawaii.

Q. Right. And how did he want to get there?

---

was not under oath nor subject to cross-examination, when the statement was made.
C. McCormick, Evidence § 39, at 74 (1954).

15. 492 P.2d 88, 91–94 (Alaska 1971).

16. Alaska R.Civ.P. 43 is made applicable to criminal procedure by Alaska R.Crim.P. 26(a).

17. 492 P.2d at 94.

A. I don't know. I guess by selling the stuff.

Q. Where was he going to get the money to get there?

[Defense Counsel] Your Honor, I think he's badgering his own witness. I would object.

THE COURT: Overruled. You may answer.

A. What was that question again?

Q. Where was he going to get the money to go to Hawaii or wherever he was going?

A. I don't know, by selling it I guess.

Q. By selling?

A. By the sale.

Q. Did you have any conversation about this with the defendant?

A. No, sir.

Q. Didn't you state to me yesterday that Danny Wright brought this acid up from Seattle?

A. That's what I said, yes.

Q. Is that true so far as you know?

A. So far as I know, yeah.

■ The first two references to prior inconsistent statements ("Do you remember telling me last night they were talking about acid?" and "Didn't you tell me yesterday that he was going to sell the acid and go to Hawaii?") were proper. Each was preceded by a specific denial contrary to what Samuelson had previously told the district attorney; each reference complied with Civil Rule 43(g)(11)[c] in that Samuelson was apprised of the prior statement, when it was related and to whom.

■ The third reference ("Didn't you state to me yesterday that Danny Wright brought this acid up from Seattle?") was not proper. The requirements of Civil Rule 43(g)(11)[c] were complied with, but there was no inconsistency. Nothing that Samuelson had said was inconsistent with the prior statement referred to by the district attorney. However, we conclude that the error in allowing this reference to Samuelson's prior statement was harmless. The jury was already aware that Samuelson had made a detailed statement to the district attorney, for Samuelson had acknowledged making the statement.

■ On the issue of whether the trial court should have given a limiting instruction, we concluded in *Beavers* that to the discretion of the trial court must be committed the decision whether or not to allow evidence of prior inconsistent statements to go before the jury with no instructions, and thereby to allow such evidence to have substantive effect.[18] We can see no abuse of discretion here. Samuelson admitted the truth of each prior statement. As we stated in *Beavers:*

> [W]e can perceive no reason for denying prior inconsistent statements whatever testimonial credit they seem to deserve.[19]

■ We therefore conclude that no reversible error was committed in the direct examination of Samuelson.[20]

Wright also argues that the court erred in denying his requests for orders requiring the state to produce notes taken by the district attorney and by Captain Bellon during conversation with Samuelson.[21]

18. *Id.*

19. *Id.*

20. Moreover, Samuelson was only one of three witnesses who, in some manner, corroborated Williams' account of the sale. The testimony of the other two has not been transcribed, but the parties have stipulated that each of the other two testified to the events that transpired at the time. Any error as alleged in the examination of Samuelson would therefore be harmless.

21. On appeal, Wright alternatively argued that the trial court erred in not conducting an *in camera* examination of the notes to determine if they should have been provided to the defense. We remanded the case to the trial court ordering it to determine if either set of notes constituted a producible statement under AS 12.45. 160 and whether either set of notes would have been useful to the defense. The superior court complied and entered the findings of fact referred to in the test.

▆▆ The relevant statutory provision is AS 12.45.060, Alaska's Jencks Act, which declares:

> After a witness called by the state has testified on direct examination, the court shall, on motion of the defendant, order the state to produce any statement of the witness in the possession of the state which relates to the subject matter as to which the witness has testified. If the entire contents of the statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use.

Failure of the state to comply with a production order results either in striking the testimony of the witness or in a mistrial.[22] For the purposes of AS 12.45.060, "statement" is defined in AS 12.45.160 as:

> (1) a written statement made by the witness and signed or otherwise adopted or approved by him; or
>
> (2) a stenographic, mechanical, electrical, or other recording, or a transcription of the statement which is a substantially verbatim recital of an oral statement made by the witness to an agent of the state and recorded contemporaneously with the making of the oral statement.

The trial court has ruled that the notes taken by the district attorney do not come within this definition and that in any event they would not have been of any benefit to the defense. The trial court also found that the notes taken by Captain Bellon had been destroyed in good faith by police personnel. After questioning the Captain about the nature of these notes, the court concluded that they were merely "jottings" which would not have been of any value to the defense.

▆▆ As a general rule, a reviewing court will accept the fact findings of a trial court in a Jencks Act case; the proper standard is that of whether the findings are "clearly erroneous."[23] For example, in Campbell v. United States, the Court stated:

> We think that these questions [of producibility under the Jencks Act] properly are ones of fact, the determination of which by the district judge may not be disturbed unless clearly erroneous.[24]

However, where a trial court does not properly inquire into the nature of the questioned statements or where its ruling is made under a mistaken impression of the applicable law, review is not so limited. In United States v. Aviles,[25] the court stated:

> As . . . [the] findings of fact were induced by a mistaken view of the law, the limited review of a district judge's findings prescribed by [Campbell v. United States] does not apply, and, in consequence, we were free to determine the facts for ourselves.

▆▆ While there is generally no "work product" exception to production under our Jencks Act,[26] "mere jottings" or cryptic summaries of statements made by interviewed witnesses are not producible.[27]

22. AS 12.45.080.

23. Canaday v. United States, 354 F.2d 849, 853 (8th Cir. 1966) (trial court's determination should not be disturbed on appeal unless it is clearly erroneous); Hayes v. United States, 329 F.2d 209, 220 (8th Cir.), cert. denied, sub nom. Bennett v. United States, 377 U.S. 980, 84 S.Ct. 1883, 12 L.Ed.2d 748 (1964) (agreed with factual finding of the lower court).

24. 373 U.S. 487, 493, 83 S.Ct. 1356, 1360, 10 L.Ed.2d 501, 507 (1963); accord,

Hance v. United States, 299 F.2d 389, 397 (8th Cir. 1962).

25. 337 F.2d 552, 557 (2d Cir. 1964), cert. denied, sub nom. Polizzano v. United States, 380 U.S. 918, 85 S.Ct. 911, 13 L.Ed.2d 803 (1965).

26. Cf. United States v. Hilbrich, 341 F.2d 555, 557 (7th Cir. 1965); Saunders v. United States, 114 U.S.App.D.C. 345, 316 F.2d 346, 349 (1963).

27. United States v. Spatuzza, 331 F.2d 214, 218 (7th Cir.), cert. denied, 379 U.S.

■ The notes taken by the district attorney are now part of the record before this court.[28]  They consist of seven pages of legal sized note paper filled with comments, questions, and one diagram.  According to Samuelson's testimony, his interview with the district attorney lasted for one hour; seven pages of cryptic notes, then, could certainly not contain a substantially verbatim recital of what Samuelson told the district attorney during such a lengthy interview.  Thus these notes do not qualify as a statement under our Jencks Act, for they are neither a substantially verbatim statement of what Samuelson said nor were they ever approved by the witness.  The lower court's finding that the notes are not producible under our Jencks Act is correct: as cryptic summaries of statements made by an interviewed witness they do not qualify as producible statements under the Jencks Act.

■ Captain Bellon's notes pose an additional problem.  According to his testimony, the notes he took were of the same nature as those taken by the district attorney.  As such, their production would not be required.  However, the notes were destroyed.  The destruction of notes prior to trial has been viewed as a device used by some law enforcement officials to avoid production under the Jencks Act.[29]  The ABA Standards Relating to Discovery and Procedure Before Trial has also pointed to this practice of some law enforcement officials who destroy their original notes to avoid production.[30]  However, if the notes in question were destroyed in good faith, without the intent to avoid production, it is the general rule that their destruction is not a ground for reversal.

In United States v. Comulada,[31] the court held that the destruction of notes, which an officer thought were no longer useful in the case, did not constitute a basis for reversal.  The situation in the case at bar appears to be similar.  Captain Bellon's notes appear to have been destroyed in good faith by police personnel during his absence from the State; since they were in cryptic form, it is quite possible that they did not seem to be important documents and were destroyed during a periodic clean-up of the Captain's office.  Therefore their destruction cannot be viewed as prejudicial.

We conclude, therefore, that the trial court committed no error in denying Wright's requests for production of the district attorney's or Captain Bellon's notes.[32]

■ Wright next challenges the sufficiency of the showing concerning the whereabouts of the LSD after it had been received by the B.N.D.D.  The only question is what happened to the LSD tablets mailed from Ketchikan between the time they were received in the B.N.D.D. office, on December 24, and the time Kirk, the B.N.D.D. chemist, removed them from the B.N.D.D. safe, on January 9.  The gap is adequately filled by Kirk's testimony at the trial.  Kirk identified initials on the envelope in which the tablets had been mailed as belonging to a secretary in the B.N.D.D. office. He also identified the signature on a postal receipt from the envelope as the signature of another B.N.D.D. secretary. Kirk further stated that it was standard procedure for secretaries receiving registered letters to initial them and place them in the B.N.D.D. safe, where they would remain until a

829, 85 S.Ct. 58, 13 L.Ed.2d 38 (1964); United States v. Crosby, 294 F.2d 928, 951 (2d Cir. 1961), cert. denied, sub nom. Meredith v. United States, 368 U.S. 984, 82 S.Ct. 599, 7 L.Ed.2d 523 (1961).

28. They were produced for the trial court upon remand.

29. E. g., United States v. Lonardo, 350 F.2d 523 (6th Cir. 1965) (reversed because federal agents had, prior to trial,

destroyed notes which appeared producible).

30. ABA Standards Relating to Discovery and Procedure Before Trial, at 62.

31. 340 F.2d 449, 451 (2d Cir. 1965).

32. We have examined the notes taken by the district attorney and conclude that even if they were producible, any error is rendered harmless by virtue of their being of no use to the defense.

chemist was ready to make an analysis of the contents. There is nothing whatsoever to indicate any deviation from the standard procedure.

The rule is well settled that in setting up a chain of evidence, the prosecution need not call upon every person who had an opportunity to come in contact with the evidence sought to be admitted. Similarly, every conceivable possibility of tampering need not be eliminated. As the court held in Gallego v. United States:

> Where no evidence indicating otherwise is produced, the presumption of regularity supports the official acts of public officers, and courts presume that they have properly discharged their official duties.[33]

Kirk's testimony placed the evidence in question in the hands of B.N.D.D. secretaries, and indicated that pursuant to normal procedure the secretaries should have put the envelope from Ketchikan into the B.N.D.D. safe. On January 9, Kirk did, in fact, remove the evidence from the safe for testing. Under these circumstances, it would appear that the presumption of regularity should apply; there is simply no reason to assume the contrary.

A subsidiary issue raised in connection with the chain of evidence problem relates to the identification of the tablets of LSD. At the trial, Kirk testified that there are two types of LSD, levorotatory and dextrorotatory. He further testified that levorotatory was uncommon and that it has a greatly reduced physiological effect. Admittedly, no testing was performed to determine whether the LSD in question was levorotatory or dextrorotatory. On appeal it is claimed that failure to establish that the LSD in question was dextrorota-

tory constituted a fatal defect. This claim has no merit. As the state correctly notes, AS 17.12.150 defines LSD as an hallucinogenic drug, and does not distinguish between various forms of the substance. It is evident that the legislature intended all forms of LSD to be illegal, and there has simply been no showing or argument that the legislature could not properly do so.

In its Instruction No. 19, the trial court apprised the jury of the fact that any person who aids or abets another in the commission of an unlawful act, or any person who causes another to commit an act which is unlawful, is punishable as if he had himself committed the act. Wright contends on appeal that this instruction was erroneous because there was no evidence which indicated that Wright participated as an accessory to the sale of LSD.[34] Wright's argument is mistaken. The testimony of John Bakken contained statements which tended to show that, while Wright did not personally make the sale, he might have arranged it. The instruction given by the court was thus correct.

One final issue remains. Wright contends that his sentence is unduly excessive and amounts to cruel and unusual punishment. No authority has been cited for the proposition that an otherwise lawful six year sentence for the sale of LSD constitutes cruel and unusual punishment under either the Alaska or the United States Constitution. While we therefore hold the constitutional claim to be frivolous, we feel it appropriate to consider Wright's claim as a sentence appeal and decide it accordingly.

AS 17.12.110(b)(1) states the penalty for a first offense of selling an hallucinogenic drug to be imprisonment for

33. 276 F.2d 914, 917 (9th Cir. 1960). *Accord*, United States v. Clark, 425 F.2d 827, 832–834 (3d Cir. 1970); Pasadena Research Laboratories, Inc. v. United States, 169 F.2d 375, 381–382 (9th Cir.), cert. denied, 335 U.S. 853, 69 S.Ct. 83, 93 L.Ed. 401 (1948); United States v.

S. B. Penick & Co., 136 F.2d 413, 415 (2d Cir. 1943).

34. The issue has been disposed of in Alaska, Ransom v. State, 460 P.2d 170, 172 (Alaska 1969).

not more than twenty-five years, a fine of not more than $20,000, or both.. We infer from the severity of the maximum punishment that the legislature considers such offenses to be extremely serious.[35] We have carefully reviewed the record and the sentencing proceedings in accordance with the standards articulated in State v. Chaney,[36] and we are unable to conclude that the trial court was clearly mistaken in imposing a six-year sentence.

Affirmed.

BOOCHEVER, J., not participating.

35. We note that even an isolated sale of a narcotic brings an offender within the second most serious of the four groups of drug offenses we referred to in Waters v. State, 483 P.2d 199, 201 (Alaska 1971). Wright admitted that the sale in question was not an isolated transaction.

36. 477 P.2d 441 (Alaska 1970).