Charles R. WHITE, Appellant,

v.

STATE of Alaska, Appellee.

No. 2952.

Supreme Court of Alaska.

April 21, 1978.

---

RABINOWITZ, Justice.

Charles White was indicted on two counts of assault with a dangerous weapon.[1] After trial by jury, guilty verdicts were returned on both counts.[2] White has appealed alleging three separate specifications of error.

■ White first asserts that AS 11.15.-220, the assault with a dangerous weapon statute, as it read at the time of the alleged offenses, was violative of equal protection and therefore unconstitutional because it permitted different punishments or different degrees of punishment for the same act committed under the same circumstances by persons in like situations. In our recent opinion in *Larson v. State,* 569 P.2d 783 (Alaska 1977), we upheld the constitutionality of former AS 11.15.220 against a similar equal protection attack. There we said, in part:

> The answer to Larson's argument is found in the explicit language of AS 11.-75.030 which states that 'a felony is a crime which *is or may be* punishable by imprisonment for a period exceeding one year.' Under AS 11.15.220, it is clearly provided that one convicted of assault with a dangerous weapon may be punished by imprisonment for a period exceeding one year, despite the fact that there also may be imposed a lesser punishment. Thus, the fact that there may be imprisonment for a period exceeding one year makes the crime a felony under AS 11.75.030, regardless of the actual punishment imposed. There is no constitutional impediment to the legislature allowing a court to impose lesser punishments for felonies than a prison term exceeding one year.[3] (footnote omitted)

Dana Fabe and Barbara J. Miracle, Asst. Public Defenders, and Brian Shortell, Public Defender, Anchorage, for appellant.

Monica Jenicek and Glen C. Anderson, Asst. Dist. Attys., Joseph D. Balfe, Dist. Atty., Anchorage, and Avrum M. Gross, Atty. Gen., Juneau, for appellee.

## OPINION

Before BOOCHEVER, C. J., and RABINOWITZ, CONNOR, BURKE and MATTHEWS, JJ.

1. At the time of the offenses, AS 11.15.220 read:

> *Assault with dangerous weapon.* A person armed with a dangerous weapon, who assaults another with the weapon, is punishable by imprisonment in the penitentiary for not more than 10 years nor less than six months, or by imprisonment in jail for not more than one year nor less than one month, or by a fine of not more than $1,000 nor less than $100.

2. White was sentenced to concurrent 5-year terms of imprisonment with 3 years suspended on condition of probation.

3. *Larson v. State,* 569 P.2d 783, 784–85 (Alaska 1977). Larson had argued that since the sentencing court could impose either a fine or prison sentence for less than one year, as opposed to a felony sentence, this amounted to an invidious discrimination.

Thus, we conclude that *Larson* is dispositive of White's first specification of error.

White next argues that he was denied due process as a result of the state's failure to preserve and produce the position and direction of his fingerprints as found on a lamp located at the scene of the crimes. White asserts that his due process rights were infringed because he had no opportunity to cross-examine or test the reliability of the evidence against him. In addition, White argues that such failure to preserve and produce violated the discovery provisions of Rule 16(b)(7), Alaska Rules of Criminal Procedure.[4]

The facts relevant to this specification of error follow. On the morning of the events in question, Michael Tarnef was present in a trailer which Cherry Sundae and Priscilla McCabe shared. At approximately 4 a. m., Tarnef heard knocking and opened the door of the trailer. White pointed a gun at Tarnef and advised Tarnef that he wanted to speak to Cherry Sundae.[5] Tarnef sent Sundae to talk to White while he remained in a bedroom to avoid any "hassles." Cherry Sundae testified that while she talked with White he pointed a gun at her head. According to Sundae, White fired a shot through an internal wall separating the living room from the bedroom as he was leaving the trailer. The shot struck Tarnef in the head.

Investigator Barnard of the Alaska State Troopers arrived at the trailer at approximately 5 a. m. on the morning of the shooting. He observed the trailer's outside lamp hanging loosely on the exterior wall.[6] Later the same morning, the officer returned to the trailer and removed the lamp, delivering it to John Sauve, a laboratory technician for fingerprinting analysis.[7] Although fingerprints were visible on the globe of the lamp, Sauve was unable to photograph them due to the contour of the glass and the design imprinted on it. Sauve did manage to lift fingerprints from the globe and then returned the lamp to Officer Barnard who subsequently returned it to the trailer. By the time of trial, the owners of the trailer had disposed of the lamp.[8]

The globe and the fingerprints lifted therefrom were of significance in the case because of the state's theory at trial that on the morning the assaults took place White allegedly had ripped the lamp from the trailer's exterior wall in an effort to conceal his presence from the occupants of the trailer. White's explanation of the presence of his fingerprints on the globe was that he had helped Sundae move from his home into Priscilla McCabe's trailer and as he was carrying her suitcases up the steps to the

---

We have studied White's arguments that the statute presented "unbridled prosecutorial discretion" and that the statute provided no guidelines governing "discretionary judicial reduction." We are not persuaded that AS 11.15.220 is unconstitutional in light of these arguments.

4. Rule 16(b)(7), Alaska Rules of Criminal Procedure, provides, in part:

Upon a reasonable request showing materiality to the preparation of the defense, the court in its discretion may require disclosure to defense counsel of relevant material and information not covered [by other subsection of Rule 16].

5. Tarnef testified that he tried to convince White to "put the gun down and . . . uncock it" but was unsuccessful:

[White] said that as long as he had the gun he was a winner and I was a loser and it would be like that always and I went back into the room and I closed the door and I sat down on the bed and the next thing I know I was shot in the head.

6. Officer Barnard testified, in part:

It was hanging on the wall by a wire—had two wires coming out of it—one was busted and one was still intact. The sheet metal screws had been ripped out of the frame of the side of the trailer—the metal of the trailer.

7. Investigator Barnard offered the following explanation as to why he returned to the trailer to remove the lamp:

I did not know at that time whether it had been torn off then or—or prior to that or if it was related to this case at all. After some more information was gathered talking to Tarnef, talking to Stone then I—you know, I felt in my own mind that there should be some significance to the light and I went back and—and took the light.

8. Investigator Barnard testified that he had tried to locate the lamp shortly before trial and had been advised by the new occupants of the trailer that they had discarded it.

trailer, he slipped and touched the lamp, thus leaving his finger and palm prints on the glass.

In this context, White contends that the laboratory technician should have preserved "some record of the placement and direction of these prints on the globe." If such a record had been made, White further argues, he would have sought to show that the position of his finger and palm prints would have supported his version of the facts, that is, that he touched the light only accidentally and fleetingly several days before the shooting when he was helping Sundae move into the trailer.

The government had no indication of the importance of either the placement or direction of the prints to White's defense until White had testified. At trial, Sauve identified the prints as belonging to White, but he could not remember the surfaces on which the prints were found or their position except that they pointed toward the center of the glass. Sauve did acknowledge that the prints could have been positioned in a way which supported White's explanation of how the prints came to be on the lamp.

At the outset, it should be noted that the accuracy of the state's fingerprint analysis is not challenged. The prints were available to White along with other evidence.[9] The reliability of the fingerprint identification could thus be tested independently. Therefore, the situation differs from that in *Lauderdale v. State,* 548 P.2d 376 (Alaska 1976),[10] where the results of a breathalyzer test could not be assessed independently because the control ampoule had been dis-

carded. In the case at bar, White contends, in effect, that due process requires the prosecution to preserve and produce the source of the tested fingerprints in order that the accused may have available potentially useful evidence.

In *Nicholson v. State,* 570 P.2d 1058 (Alaska 1977), we addressed the prosecution's failure to preserve and produce evidence—an issue which arose in a factual context somewhat similar to the case at bar. In *Nicholson,* appellant argued that he was denied due process by the state's failure to preserve and produce certain evidence from the scene of the crime which might have supported appellant's version of the facts. In rejecting Nicholson's claim, we said, in part:

Adoption of appellant's views would impose an extremely difficult burden on the state to preserve intact almost every physical detail of a crime scene. Here the investigators of the homicide had no indication of the relevance of either the tire or the furnace at the pertinent times during their investigation. Nor is there any indication that the failure to preserve these items was other than as a result of a good faith determination during the course of a crime investigation.[11]

*Nicholson* is of some significance to the resolution of this aspect of White's appeal. On the other hand, *Nicholson* is factually distinguishable since the question here is whether investigative personnel are required to preserve items already in their custody which had been submitted for laboratory examination. In the case at bar, the state recognized that the prints themselves

**9.** The record shows that prior to trial White's counsel was afforded the opportunity to compare White's prints with those lifted from the lamp's surface.

**10.** Nor is any other Alaska case precisely on point. In *Torres v. State,* 519 P.2d 788 (Alaska 1974), the prosecution's case included reference to physical evidence which inadvertently had been destroyed prior to trial. No such use of missing materials was made at White's trial. *Wright v. State,* 501 P.2d 1360 (Alaska 1972), is also distinguishable. In *Wright,* an investigator's notes of an interview with a witness had been destroyed in good faith by police person-

nel prior to trial. The witness had been available to the defendant. In the instant case, it is the source of the tested prints which is at issue—not the notes or comments of the person who analyzed them. Unlike *Lee v. State,* 511 P.2d 1076 (Alaska 1973), the testing process did not use up the entire residue of evidence and thus make subsequent testing impossible. Instead, the context in which the testable evidence was found has been lost by the state's failure to retain and preserve the lamp from which the prints were lifted.

**11.** *Nicholson v. State,* 570 P.2d 1058, 1064 (Alaska 1977).

were material evidence because they connected White to the scene of the assaults. Accordingly, the prints were lifted from the lamp's surface in a proper manner; and the lifted prints were preserved and were made available to defense counsel. The context in which the prints appeared was not material to the question of White's presence at the trailer; and, as noted previously, its significance for White's explanation of his presence was not apparent until he offered that explanation at trial.

■ In the absence of such evidence, White was not precluded from arguing his account of the presence of the fingerprints because the state's laboratory technician acknowledged that the position of the prints as he remembered them could have been consistent with White's explanation. However, even if the position and direction of the prints had been as White contends, his account of how they came to be positioned in that manner would not have been established to the exclusion of the state's explanation.[12] Thus, while the position and direction of the prints might have been of some use to White in arguing his version of the facts, such contextual evidence can hardly be viewed as exculpatory in itself. Here, the materiality of the evidence is marginal at best and there exists no hint or suggestion of bad faith on the government's part.[13] White neither requested the item nor indicated the importance of the general type of evidence involved. In these circum-

stances, we hold that any resulting deprivation arising from a failure to preserve and produce the fingerprints' position and direction does not rise to the level of a due process violation,[14] and that the state's failure to preserve and produce the position and direction of the fingerprints as found on the lamp did not violate Criminal Rule 16(b)(7).

In his third specification of error, White contends that his right to confrontation and cross-examination was violated by the superior court's failure to allow the introduction of hospital records reflecting statements of Cherry Sundae made subsequent to a recent suicide attempt.[15] The hospital records included comments made by Sundae concerning her belief that someone had held a gun to her head. White argues that Sundae's statements were not offered to show the truth of the statement itself but rather to show only that it was made; thus, it was not hearsay. Alternatively, White contends the record entries should be admissible—even if they were hearsay—under the business records exception to the hearsay rule.

■ Initially, we note that although the hospital record entries reflecting Sundae's statements were not being offered to show the truth of what she said, the record entries were being offered to show the truth of the matter asserted in the hospital record, i. e., that Sundae did in fact make such statements while hospitalized. Thus,

12. Although the record is somewhat confusing on this issue, Inspector Barnard implied on cross-examination that Sauve's testimony about the shape of the lamp and the positions of the prints tended to support White's theory. However, Barnard also testified that the print configuration on the lamp could support the state's theory.

13. As we have noted, the situation differs from *Nicholson v. State,* 570 P.2d 1058 (Alaska 1977), in that here the government had selected the lamp as the source of evidence relevant to its own case. In such circumstances, the better police practice would have been to maintain custody of the lamp and to make a record of the prints' location on the globe. At a minimum, preservation of the prints' position and direction would require that investigators photograph the object from which the prints were to be lifted in order to supply the defense with

necessary data. In the case at bar, however, the state's laboratory technician testified that the raised design of the glass caused reflections which prevented his photographing the prints, although he attempted to do so.

14. We note that cases may well arise in which evidence is destroyed in good faith but such evidence is so critical to the defendant's case that he would be denied a fair trial without its use and a due process violation would result. Accordingly, we do not foreclose the claim of a due process violation in appropriate circumstances.

15. Approximately one month before the events leading to White's arrest, Sundae had attempted to commit suicide by ingesting large quantities of valium and chloral hydrate.

the use of hospital record entries was technically hearsay.[16] Nevertheless, such record entries may be admissible if an appropriate exception to the hearsay rule applied.[17] Although courts have diverged widely over the admissibility of hospital records, this court has concluded that hospital records should be admissible as an exception to the hearsay rule.[18] However, even if these particular hospital entries are within an exception to the hearsay rule, their exclusion was error only if they were otherwise properly admissible upon a sufficient offer of proof.

White argues that the record entries were relevant because they tended to prove that Sundae was incapable of either accurately perceiving or remembering certain events. Alternatively, he contends, the evidence tended to show that when under stress, Sundae was likely to believe someone was holding a gun to her head. The state

argues that the superior court's exclusion of the evidence should be upheld because the exclusion as "not clearly unreasonable or untenable."[19] The state further argues that White's offer of proof was insufficient since no showing had been made that Cherry Sundae had a "mental disorder" affecting her capacity to perceive and because Sundae had not been cross-examined on either the statements contained in the hospital record or her ability to perceive.[20]

■ We believe the record shows that White's offer of proof was inadequate. White's counsel argued that Cherry Sundae's statements in the hospital record went to her state of mind. However, evidence offered for that purpose is relevant only if it goes to her state of mind at the time of the events to which she is testifying (or at

16. Hearsay is '[e]vidence of a statement which is made other than by a witness while testifying at the hearing offered to prove the truth of the matter stated . . .'
*P. H. v. State,* 504 P.2d 837, 843 (Alaska 1972), quoting from *Meyst v. East Fifth Ave. Serv., Inc.,* 401 P.2d 430, 437 n.15 (Alaska 1965), which referred to the Uniform Rules of Evidence, Rule 63. *See also* Proposed Alaska Rules of Evidence, Rule 801(c); Federal Rules of Evidence, Rule 801(c).

17. *See Zerbinos v. Lewis,* 394 P.2d 886, 889 (Alaska 1964). *See also Patrick v. Sedwick,* 391 P.2d 453 (Alaska 1964).

18. In *Zerbinos v. Lewis,* 394 P.2d 886, 889 (Alaska 1964) (suit to recover for personal injuries suffered in an automobile accident), the Alaska Supreme Court found error in the trial court's failure to admit certain hospital records covering the period that the plaintiff was hospitalized after the accident. The court explained:
 It cannot be denied that the hospital records constituted hearsay, but by court rule in Alaska they are admissible as evidence if they meet the requirements of Civil Rule 44(a)(1) . . . .
 The hospital records in this case were authenticated by stipulation. The defendant makes no claim that they were untrustworthy or privileged and we have no way of judging the defendant's assertion that they contained irrelevant matter because the records were not sent up on appeal. Under these circumstances, we conclude that it was error for the trial court to refuse to admit the records in evidence. In many jurisdictions today, under statutes similar to our Rule 44(a)(1), hospital records are held to be ad-

missible when relevant to an issue and when a proper foundation has been laid. (footnote omitted)
Criminal Rule 26(e) provides that "an official or business record or an entry therein . . . may be proved in the same manner as in civil actions." Accordingly, Civil Rule 44(a)(1) establishes standards for admissibility of hospital records in the case at bar. *See also* Proposed Alaska Rules of Evidence, Rule 803(f); C. McCormick, Handbook of the Law of Evidence § 313, at 730–33 (Cleary ed. 1972); 6 J. Wigmore, Evidence in Trials at Common Law § 1707, at 51–52 (Chadbourne rev. 1976).

19. In ruling on the admissibility of evidence, we have noted that these matters are for the sound discretion of the trial court and will be overturned only when there has been an abuse of discretion. *Lewis v. State,* 469 P.2d 689, 695 (Alaska 1970). In *Lewis,* we also noted that one of the recognized tests for an abuse of discretion is whether the reasons given for the exercise of discretion were untenable or unreasonable. *Id.*

20. Our reading of the record shows that White did not offer the hospital records to establish the insanity of the witness. Rather, the hospital record entries tended to show that Sundae's ability to perceive or remember may have been such that the jury could appropriately disbelieve her testimony—particularly her testimony concerning White holding a gun at her head. Such an attack goes to credibility rather than competency. C. McCormick, Handbook of the Law of Evidence § 45, at 93–94 (Cleary ed. 1972).

1062

the time she testified). White also failed to explain that the extrinsic evidence was offered to show mental or physical defects. No expert testimony supporting such a contention was offered. Nor was there any suggestion of how the statements would be connected to other evidence to show that there was no basis for the prior statements. Although the exchange among trial counsel and court might have been understood as indicating that White's introduction of the hospital records was intended for a purpose other than to show state of mind or prior inconsistent statements, the offer of proof was obscure, at best. Given White's confusing offer of proof and his failure to question Sundae regarding the prior statements, we hold that the superior court's exclusion of the hospital records was proper.

Assuming arguendo that it was error for the superior court to have excluded the hospital records, we would hold that such error was harmless under the standards of *Love v. State,* 457 P.2d 622, 629–32 (Alaska 1969).[21] In reaching this conclusion, we deem the following facts of particular significance. Michael Tarnef testified on direct examination that White "had [the gun] . . . aimed at Cherry." Tarnef also stated that White "had it at my head." Sundae's housemate at the trailer, Priscilla McCabe, testified that Sundae had been under extreme emotional stress after her suicide attempt; but while living at the trail-

er, Sundae was recovering and no longer was severely distressed. On both examination and cross-examination, Cherry Sundae related the circumstances surrounding her suicide attempt, hospitalization, memory lapses and similar problems. Sundae admitted having trouble remembering details after her hospitalization and stated that she believed brain damage had resulted from her suicide attempt. She also acknowledged that after leaving the hospital she was bothered by episodes of falling and by a ringing in her ears. In addition, she was confused about whether she had said that White "had it at my head"; and she could not remember exactly what she had said to the grand jury. She was also somewhat unclear about her statement to Investigator Barnard but eventually insisted, "I remember saying that he placed it at my head."[22]

In light of these facts, we think the exclusion of Cherry Sundae's statements contained in the hospital record was harmless error. White had successfully established that Sundae's emotional condition had been unstable prior to the night of the shooting, that she experienced lingering symptoms after leaving the hospital including absent-mindedness, and that she may have suffered brain damage. Thus, the hospital record statements could have been only cumulative in showing Sundae's impaired capacity to perceive or remember. In addition, the specific statement sought to be

**21.** White argues that the refusal to admit the hospital record entries is "a clear violation of appellant's right to confrontation and cross-examination" requiring reversal as constitutional error. However, appellant's characterization is inaccurate: the superior court's exclusion of Cherry Sundae's statements affected only defense counsel's ability to impeach Sundae's credibility. White's cross-examination was in no way limited by the superior court's ruling. Cherry Sundae could have been questioned thoroughly about the statements in the hospital record since White had full knowledge of the record entries. Therefore, no materials crucial to effective cross-examination were being withheld. Indeed, the superior court indicated that had Sundae been cross-examined on the statements, her denial would have been enough to permit introduction of the hospital records. White did not pursue his cross-examination opportunities. Denial of a subsequent attempt

to present statements of Cherry Sundae which were not explored on cross-examination and which do not contradict her previous testimony should not be viewed as an impairment of effective cross-examination. Accordingly, the constitutional error standard of *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), and *Evans v. State,* 550 P.2d 830, 840 (Alaska 1976), is not applicable, and the harmless error standard articulated in *Love v. State,* 457 P.2d 622, 629–32 (Alaska 1969), is applicable.

**22.** Officer Barnard explained on redirect that Sundae had told him, "[T]he gun was held at my head;" but that he had erroneously interpreted her as meaning "that it was held to her temple." Thus, her statement to Barnard during his investigation was consistent on that point with her trial testimony.

introduced, *i. e.,* "he had a gun at my head" was specifically corroborated by the only other witness who actually saw White in the trailer. Testimony of two other people who were present at the trailer supported other details of Sundae's testimony regarding events surrounding the assaults. Accordingly, still assuming arguendo that the superior court's refusal to admit the hospital record was error, such error was harmless error.

Affirmed.