Elmer J. NICHOLSON, Appellant,

v.

STATE of Alaska, Appellee.

No. 2417.

Supreme Court of Alaska.

Nov. 4, 1977.

Lawrence J. Kulik, Anchorage, for appellant.

Ivan Lawner, Asst. Dist. Atty., Joseph D. Balfe, Dist. Atty., Anchorage, and Avrum M. Gross, Atty. Gen., Juneau, for appellee.

Before BOOCHEVER, Chief Justice, RABINOWITZ, CONNOR and BURKE, Justices and DIMOND, Justice Pro Tem.

## OPINION

RABINOWITZ, Justice.

Nicholson appeals from his conviction for first degree murder. The trial in the superior court was bifurcated. The first part was a trial by jury in which Nicholson was found guilty of first degree murder in the homicide of Tom Dillon, chief of police in Bethel. The second part was an evidentiary hearing by the court, without a jury, in which the court determined that Nicholson was criminally responsible for his acts.[1]

At the time of the homicide, Nicholson was 21 years old and had lived most of his life in Bethel. Nicholson began drinking the night prior to the homicide. He consumed a large amount of alcohol that night and continued drinking the next morning. In the late afternoon of that day, November 19, 1972, Norman Wallace, owner of the Yellow Cab Company in Bethel, saw Nicholson as he was coming out of a police truck. Nicholson, who had blood on his face and hands, was carrying a dead puppy. Nicholson told Wallace that a Yellow Cab had killed his puppy. Wallace replied that he did not know anything about it, but he would try to find out if they had run over the dog. They went to the Yellow Cab garage,[2] where Nicholson sat on the floor, rocking back and forth with the puppy, stating, "Yellow Cab will pay."

Subsequently, Nicholson went to his cousin's home where he picked up his 12-gauge shotgun and some shells. Nicholson testified that after he left his cousin's house, he returned to the Yellow Cab garage where he shot twice into the furnace and once into the wheel of a truck. He then left the garage, entered a Yellow Cab van, and had the driver call Wallace and say that somebody wanted to see him at the garage.

When Wallace and Nicholson arrived at the garage, Nicholson got out of his cab and chambered a round of ammunition.[3] Wallace testified that Nicholson pointed the gun at him through the windshield of the taxi and told him to get out and that he [Nicholson] was going to kill him. According to Nicholson, he was pointing the gun at the door of the driver's side, and he told Wallace to get out of the car so that he could show Wallace his dog. Nicholson further testified that he did not remember saying he was going to shoot Wallace. Nicholson stated that he did not intend to shoot Wallace and he was confronting him with the gun to try to make Wallace find out who killed his dog.

At this time, a police vehicle arrived at the garage. Police Chief Tom Dillon got out of the vehicle. While pointing his pistol at Nicholson, he told Nicholson to drop his gun. Nicholson turned and trained his shotgun on Dillon. They began talking and Dillon persuaded Nicholson to drop the muzzle of the gun toward the ground. During this conversation, Nicholson either told Chief Dillon he wanted to talk in the garage or told Dillon that he wanted to show him the dog's body which was in the garage.

Wallace testified that as Dillon walked to the garage and opened the doors, Nicholson brought his gun back up to his shoulder. Dillon was not pointing his pistol at Nicholson. Nicholson testified that when Dillon went into the garage, he [Nicholson] walked around Wallace's taxi and ejected shells from his gun.[4] He testified that he wanted Dillon to shoot him;[5] he thought his own

---

1. This finding was made under the standards of AS 12.45.083.

2. Yellow Cab was using the garage attached to the home of Nicholson's parents.

3. Wallace testified that no shell was ejected from the shotgun when the round was chambered.

4. Two unfired shells were found in this area. The FBI tests revealed that one had definitely been ejected from Nicholson's gun. There were insufficient markings on the other to determine whether it had been ejected from that shotgun.

5. Alice Nerby testified that she heard Nicholson yelling at Dillon to use his gun. Nicholson did not remember that but stated he did want Dillon to use his gun. During this time, Julia Nicholson, appellant's mother, was yelling at the policemen to shoot her son in the arm or leg.

gun was unloaded. Nicholson testified that when Dillon would not shoot him, he made an action like putting a shell into the chamber and the gun went off. Dillon fell to the ground while firing; Nicholson turned and ran. Although Nicholson did not realize it, he had been wounded by one of Dillon's shots.

Other witnesses testified that Nicholson shot twice (or more) and that Dillon was also firing. The testimony of various witnesses is conflicting as to the timing of the shots and the number of shots fired. Many witnesses were impeached by the use of prior inconsistent statements on these points, and rehabilitated with prior consistent statements.[6]

After the shooting of Chief Dillon, Nicholson fled across the river where he remained for some time. When he came back across the river, Nicholson was arrested. At the time of his arrest, there were two shells in the shotgun, one in the magazine and one in the chamber.[7]

As this case has developed since the appeal was filed, Nicholson's primary specification of error relates to the superior court's denial of his request that the prosecutor be ordered to disclose whether he possessed any witness' statements taken personally by him and if so, to produce such statements.[8] This specification of error, as originally filed, related to statements made to the prosecutor by Alice Nerby and perhaps others. Due to the later discovery of another statement made to the prosecuting attorney, we have determined that the precise issue as originally presented need not be considered. After the parties had filed their initial appellate briefs, the State of Alaska filed a "Motion to Supplement the Record."[9] In support of the motion, Assistant District Attorney Ivan Lawner filed an affidavit in which he averred:

On November 19, 1976, Mr. J. Randall Luffberry turned over all of his interview notes in this case which he had kept in his personal custody. These notes include his notes of an interview with Ben Dale. Upon reviewing all of these notes and in reviewing some of the police reports in the case, I ·have determined that the notes of the interview with Ben Dale may contain exculpatory material which might have corroborated the defendant's version of the number of shots that he fired. The portion of the interview notes which relate to the number of shots was not duplicated in the police report of the police interview with Ben Dale.

After we granted the state's motion to supplement, the appeal was argued to this court. At oral argument counsel for the state admitted that it appeared that the notes taken by Mr. Luffberry of his interview with Ben Dale contained exculpatory material. Counsel for the state suggested that the matter be remanded to the superior court to conduct an evidentiary hearing for the purpose of determining "the meaning of the notes," *i. e.*, whether Ben Dale's statement to Mr. Luffberry, in fact, contained exculpatory material.

In speaking of the government's duty to accord discovery of exculpatory information in its control to an accused, in *Scott v. State*, 519 P.2d 774, 778 (Alaska 1974) (dicta), we said:

The prosecution has an affirmative duty to disclose to an accused any information

---

**6.** The trial was held approximately 14 months after the shooting.

**7.** Nicholson testified that he was certain he did not reload the gun after shooting Dillon.

**8.** Criminal Rule 16(b)(1)(i) provides:
(b) Disclosure to the Accused.
(1) *Information Within Possession or Control of Prosecuting Attorney.* Except as is otherwise provided as to matters not subject to disclosure and protective orders, the prosecuting attorney shall disclose the following

information within his possession or control to defense counsel and make available for inspection and copying:
(i) The names and addresses of persons known by the government to have knowledge of relevant facts and their written or recorded statements or summaries of statements[.]

**9.** In part, the state's motion sought to supplement the record with a copy of prosecutor J. Randall Luffberry's notes of an interview with Ben Dale.

within its control which tends to negate defendant's guilt.[10] (footnote omitted)

This philosophy was also illustrated in our promulgation of Alaska Criminal Rule 16(b)(3), which provides:

> *Information Tending to Negate Guilt or Reduce Punishment.* The prosecuting attorney shall disclose to defense counsel any material or information within his possession or control which tends to negate the guilt of the accused as to the offense or would tend to reduce his punishment therefor.

We note further that the Alaska Code of Professional Responsibility Disciplinary Rule 7–103(B) provides:

> A public prosecutor or other government lawyer in criminal litigation shall make timely disclosure to counsel for the defendant, or to the defendant if he has no counsel, of the existence of evidence, known to the prosecutor or other government lawyer, that tends to negate the guilt of the accused, mitigate the degree of the offense, or reduce the punishment.

Of particular significance to this problem is the decision of the Supreme Court of the United States in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). There the defendant had requested production of the extra-judicial statements of his co-defendant who had been tried separately. The prosecution had 'shown defense counsel several statements, but the one in which the co-defendant admitted committing the actual homicide was withheld. The Supreme Court of the United States held that suppression of that statement was a violation of due process. The Supreme Court stated:

We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.

. . . A prosecution that withholds evidence on demand of an accused which, if made available, would tend to exculpate him or reduce the penalty helps shape a trial that bears heavily on the defendant. That casts the prosecutor in the role of an architect of a proceeding that does not comport with standards of justice . . . .[11]

A crucial issue in the presentation of the defense was the number of shots fired by Nicholson. Nicholson testified that he shot only once and that the shot was fired accidentally from the gun he thought he had emptied. The prosecution contended that two shots were fired and argued that the firing of two shots indicated premeditation. In light of these facts and Mr. Lawner's representations, we ordered that this aspect of the case be

> remanded to the Superior Court to hold an evidentiary hearing for the purpose of determining:
>
> (a) Whether Ben Dale gave statements to the then Assistant District Attorney Mr. Luffberry, which contained potential evidence favorable to Elmer Nicholson. More particularly, whether Ben Dale stated he heard one or two shotgun shots at the time of the shooting of Tom Dillon.[12]

---

**10.** In support of this statement, we cited *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *United States ex rel. Butler v. Maroney*, 319 F.2d 622, 627 (3d Cir. 1963); *People v. Hoffman*, 32 Ill.2d 96, 203 N.E.2d 873 (1965).

**11.** 373 U.S. at 87–88, 83 S.Ct. at 1197, 10 L.Ed.2d at 218–19. *See also* Criminal Rule 16(b)(1)(i).

Assuming the notes contained exculpatory information, the question as to whether Mr. Luffberry's interview notes of Ben Dale themselves should have been turned over to Nichol-

son's counsel or whether mere disclosure of their contents would have been sufficient need not be determined since neither was done. We further observe that the notes in question do not contain anything which could properly be classified as attorney work product.

**12.** Concerning this portion of our remand order, we stated further:

If Ben Dale's statement was that he heard only one shotgun shot, this would have been very significant to Nicholson's presentation of his defense, for Nicholson was unable at trial to produce a single witness who consist-

Pursuant to our remand, a hearing was held at which both Mr. Luffberry and Ben Dale testified. At the conclusion of the hearing, the superior court made findings which included the following:

It is clear from the testimony today that Mr. Ben Dale did drive up to within about 100 feet of the scene of this incident, approaching from an opposite direction, that he was driving a pickup truck. When he stopped the engine and stepped from the pickup truck he heard one shot appearing to be that of a shotgun—a loud boom as compared to the successive shots which were more in the sound of cracks indicating that those were the sounds of the pistol or revolver that Mr. Dillon had. It is apparent to the court that the same statement that was made by Mr. Dale today was that given to Mr. Luffberry at the time of the interview. Mr. Luffberry likewise recalls clearly that Mr. Dale did hear only the one shot.

On the basis of the superior court's findings, we have determined that the prosecutor had in his possession or control evidence which was exculpatory or which would have tended to reduce Nicholson's punishment. Thus, we must determine whether it is necessary to remand for a new trial because of the prosecutor's failure to disclose this exculpatory material.

In *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the United States Supreme Court held that a new trial was required where the prosecutor had failed to disclose requested exculpatory materials. The Court noted that the result was not intended to punish society for the failings of a prosecutor. The purpose of

the rule is to ensure that the accused was granted a fair trial. The Court wrote:

Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly.[13]

Recently, the United States Supreme Court decided *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), another case involving the duty of the prosecution to disclose exculpatory material. The Court noted that the *Brady* rule that nondisclosure deprives an accused of a fair trial was arguably applicable in three situations: (1) where the undisclosed information demonstrates that the conviction was obtained through the use of perjury about which the prosecutor knew or should have known;[14] (2) where the defense has made a pretrial request for specific evidence;[15] and (3) where the defense has made a general request for "*Brady* material" or where no request has been made.[16] The Court goes on to hold that with respect to the third category the constitutional obligation to disclose does not extend to any information which might affect the jury's verdict. Although in discussing reversibility, the Court states that in cases of nondisclosure "the defendant should not have to satisfy the severe burden of demonstrating that newly discovered evidence probably would have resulted in acquittal,"[17] it holds:

[I]f the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omission must be evaluated in the context of the entire

---

ently testified that only one shotgun shot was fired.

**13.** 373 U.S. at 87, 83 S.Ct. at 1197, 10 L.Ed.2d at 218.

**14.** 427 U.S. at 103, 96 S.Ct. at 2397, 49 L.Ed.2d at 349. The Court lists *Mooney v. Holohan*, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935), as an example of this situation. These cases involve prosecutorial misconduct and a corruption of the truthseeking function of the judicial system.

**15.** *Id.* at 104, 96 S.Ct. at 2397, 2398, 49 L.Ed.2d at 350. The Court gives *Brady* as an example of this situation. The Court determines that *Brady* "indicates that implicit in the requirement of materiality is a concern that the suppressed evidence might have affected the outcome of the trial." *Id.*

**16.** *Id.* at 106–107, 96 S.Ct. at 2398–99, 49 L.Ed.2d at 351–52. The Court states that *Agurs* typifies this situation.

**17.** *Id.* at 111, 96 S.Ct. at 2401, 49 L.Ed.2d at 354.

record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt.[18]

▆▆▆ We have determined that the case at bar best fits within the second _Agurs_ category. Although we do not have a _pretrial_ request of record,[19] during the trial an objection was raised by the defense counsel that he had not been supplied with a copy of the statements made to the prosecutor by potential witnesses. During the discussion of the failure to disclose the statement of the witness then testifying, defense counsel made a specific request for the statements or summaries of the statements of "potential witnesses." Such a request is sufficiently specific to fall within the second _Agurs_ category. In cases falling within this category, a new trial is required by due process if "the suppressed evidence might have affected the outcome of the trial." [20] In light of our careful review of the record in the case at bar, we have determined that the testimony of Ben Dale might have affected the outcome of the trial. Nicholson's version of the shooting was believable only if the jury believed that he fired just once. Dale would have substantiated the single shot theory. As the

case was originally tried, Nicholson was unable to produce a single witness who consistently testified that only one shotgun shot was fired. Had the defense known and been able to present what Dale heard, the jury might have found that a reasonable doubt existed. Therefore, we remand this matter for a new trial.[21]

Even if we had not found constitutional error in this case, we would have found it necessary to remand for a new trial. As previously noted, Alaska Criminal Rule 16(b)(3) imposes an affirmative duty to disclose exculpatory material to the defense. Even if the violation of the rule is not reviewed under the standard of constitutional error,[22] under the less stringent test applied in non-constitutional error situations as articulated in _Love v. State_, 457 P.2d 622, 630 (Alaska 1969), we would find reversible error and remand for a new trial. The testimony which could have been given by Ben Dale was so vital to Nicholson's defense that the nondisclosure could not be deemed harmless error.

Our disposition of the nondisclosure issue has made it unnecessary to discuss in detail all of the remaining specifications of error. Nevertheless, in order to assist the superior court when it retries this case, we will address two of the remaining specifications of error.

▆▆▆ Nicholson contends that the failure of the state to preserve and produce the

18. _Id._ at 112, 96 S.Ct. at 2402, 49 L.Ed.2d at 355. In his dissenting opinion, Mr. Justice Marshall asserts that despite the language to the contrary, the Court's standard treats these cases of nondisclosure no differently than cases involving requests for new trial on the basis of newly discovered evidence. _Id._ at 116, 96 S.Ct. at 2403, 49 L.Ed.2d at 357.

19. In this record on appeal, we have neither a record of the omnibus hearing nor an order signed by the superior court determining that an omnibus hearing was unnecessary in this matter as provided by Alaska Criminal Rule 16(f). At the omnibus hearing it is the duty of the trial court to "[a]scertain whether the parties have completed the discovery required in sections (b) and (c)" of Criminal Rule 16. The disclosure of exculpatory material is required by Rule 16(b)(3); the discovery of the statements or summaries of statements made by persons having knowledge of relevant facts and

who are known by the state is required by Rule 16(b)(1)(i).

20. _United States v. Agurs_, 427 U.S. at 104, 96 S.Ct. at 2398, 49 L.Ed.2d at 350.

21. Since we need not determine whether the due process provision of the Alaska Constitution, article I, section 7, requires a different standard than that required by the due process clause of the United States Constitution as interpreted in _Agurs_, we expressly reserve that question until presented in an adversary manner in an appropriate case.

22. The standard of review for error is set out in _Chapman v. California_, 386 U.S. 18, 23–24, 87 S.Ct. 824, 827–828, 17 L.Ed.2d 705, 710–11 (1967), and was adopted by this court in _Evans v. State_, 550 P.2d 830, 840 (Alaska 1976).

furnace and tire into which he purportedly shot constituted a denial of due process.[23] Trooper Campbell testified that he did not think either the furnace or the tire was particularly important, and thus he did not seize them. The tire was destroyed—not by the authorities but by Norman Wallace, its owner. It is not clear from the record what happened to the furnace.[24] The importance of the items to the defense theory was not apparent until Nicholson testified. However, the state maintained as early as the grand jury proceedings that the second shot fired by Nicholson hit the furnace. Nicholson argues that he was never able to examine "the single most damaging piece of evidence" against him. Evidence adduced at trial with respect to the size and positioning of the two holes in the furnace varied considerably. Had the defendant known exactly where the holes were placed and their size, he might have been able to disprove the state's theory that the second shot allegedly fired by Nicholson hit the furnace.

The state argues that the authorities cited by Nicholson do not suggest that "when the police are investigating a crime they must track down every conceivable investigative lead and seize every scintilla of evidence, regardless of its apparent importance or lack of importance at the time, or run the risk of denying a defendant due process or his discovery rights." Furthermore, the state argues, the items were never in the sole control of the police and thus the defense had equal access to the items.

We find the state's argument persuasive. Adoption of appellant's views would impose an extremely difficult burden on the state to preserve intact almost every physical detail of a crime scene. Here the investigators of the homicide had no indication of the relevance of either the tire or the furnace at the pertinent times during their investigation. Nor is there any indication that the failure to preserve these items was other than as a result of a good faith determination during the course of a crime investigation.

The next specification of error involves testimony admitted at trial about a trajectory experiment. As noted, the number of shots fired and the unloading of the gun prior to the confrontation which resulted in Dillon's death were facts crucial to Nicholson's defense. When investigating the scene, the police recovered five spent 12-gauge shotgun shells and two live shells. Trooper Campbell testified with respect to the location of each of these. An FBI expert testified that the microscopic markings on one of the live shells confirmed that it had been loaded into and ejected from the defendant's shotgun. He could not state an opinion with respect to the second live shell.

John Sauve, an identification technician for the Alaska State Troopers, testified about an experiment which he conducted using Nicholson's shotgun and the same type ammunition found at the scene of the shooting. The purpose of the experiment was to determine the distance and direction traveled by spent and live shells ejected from the gun. The test was conducted outside in approximately nine inches of loose snow. The temperature was about 5° F., and there was a 10 knot wind blowing towards Sauve. The gun was held both at the shoulder and the waist with no significant difference in result. Sauve testified about the air distance traveled by the eject-

---

**23.** Nicholson contends that the failure of the state to preserve and produce the furnace and tire which Nicholson testified he shot constituted a denial of due process. He cites *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *Giles v. Maryland*, 386 U.S. 66, 87 S.Ct. 793, 17 L.Ed.2d 737 (1967); *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959); *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *United States v. Bryant*, 142 U.S.App. D.C. 132, 439 F.2d 642 (1971); *United States v.*

*Harrison*, 173 U.S.App.D.C. 260, 524 F.2d 421 (1975); and *Lauderdale v. State*, 548 P.2d 376 (Alaska 1976). None of these cases involves the failure to gather physical evidence from the scene of a crime. All involve questions of the preservation of evidence already gathered by the authorities or created by the authorities.

**24.** Photographs of the evidence were introduced at trial and are part of the record on appeal.

ed shells, both live and spent, and the direction of ejection.

 Nicholson contends that the experiment "was worthless and its results were erroneously reported to and elaborated upon to the jury." The standard for admissibility of experimental data was articulated by this court in *Love v. State*, 457 P.2d 622 (Alaska 1969). There we noted:

> It is stated almost universally that for [the results of an experiment] to be admissible, it should have been developed under conditions substantially similar to those surrounding the event in issue. The rule of substantial similarity of conditions does not require an identity of conditions but only that degree of similarity which will insure that the results of the experiment are probative. In some cases a high degree of similarity may not be attainable, yet the evidence nevertheless may be enlightening to the jury.
>
> As with other forms of circumstantial evidence, the trial judge may, in his discretion, exclude the experimental evidence after a determination that the probative value of the experimental evidence is outweighed by the possibility of prejudice, confusion of the issues or undue consumption of time. This discretion is, however, dependent upon a showing of substantial similarity of conditions by the proponent of the evidence. (footnotes omitted)

457 P.2d at 627. We went on to hold:

> In applying the test of substantial similarity, the trial court should be guided by the following principles: Are the dissimilarities likely to distort the results of the experiment to the degree that the evidence is not relevant? Can the dissimilarities be adjusted for or explained so that their effect on the results of the experiment can be understood by the jury?

457 P.2d at 628.

Nicholson asserts that Sauve's experiment was not conducted under conditions which were substantially similar to those surrounding the shooting. Nicholson points to differences in the surfaces,[25] the wind velocity and perhaps the wind direction.[26] The state points to the similarities, namely, the same gun and the same types of ammunition. The state also points out that Sauve testified only about air distance and said he could not make any determinations about rolling distance.

 In applying the *Love* test for substantial similarity, it is necessary to reach two determinations. In this case, there are significant dissimilarities, particularly if the test results are used to determine where Nicholson was standing when he fired the shots.[27] The question is whether the ejection pattern is relevant in ascertaining the ultimate location of a shell and thus would assist the fact finder in determining where Nicholson was standing when he ejected the shell. Here we think it was not relevant, except to determine the direction in which the shells ejected. Given the extent of activity at the scene in this case and the vast difference in surface conditions, we believe the ejection pattern has virtually no probative value in determining the ultimate location of the shells. However, the similarities were explained to the jury and the superior court admitted the results only on the issue of air distance traveled. Thus, pursuant to the second *Love* determination, we conclude that the superior court did not abuse its discretion by admitting the results of the Sauve experiment.

Reversed and remanded for a new trial.

25. The experiment was conducted in nine inches of loose snow. At the shooting scene, three shells were found on the garage floor and two outside on hard compact snow.

26. One witness testified that the wind was 10–15 knots blowing parallel to the street. The wind was 10 knots during the experiment. It is not apparent from the record whether the wind would have been blowing toward Nicholson.

27. It should be noted here that three spent shells were found in the garage—one near the furnace, one near a stack of tires and a third in front of the truck. This placement basically corroborated the defendant's testimony. Two spent shells were found outside the garage. All five had been fired from the defendant's shotgun.