Michael CARMAN, Appellant,

v.

STATE of Alaska, Appellee.

No. 3619.

Supreme Court of Alaska.

Dec. 21, 1979.

---

Linda L. Walton, Rice, Hoppner, Hedland, Fleischer & Ingraham, Fairbanks, for appellant.

Steven J. Call, Asst. Dist. Atty., Harry L. Davis, Dist. Atty., Fairbanks, Avrum M. Gross, Atty. Gen., Juneau, for appellee.

## OPINION

Before RABINOWITZ, C. J., BOOCHEVER, BURKE and MATTHEWS, JJ., and DIMOND, Senior Justice. [CONNOR, Justice, not participating.]

MATTHEWS, Justice.

Michael Carman was convicted of armed robbery. He was also convicted of first degree murder on two theories: an intentional killing with malice and a killing in the course of a felony. He made a motion for a new trial based on two grounds: newly discovered evidence and failure of the prosecution to disclose evidence pertaining to the credibility and · bias of prosecution witnesses. The motion was denied. We hold that it should have been granted.

### I

On the morning of October 22, 1976, a passing telephone repair crew discovered

the body of Mark Dale Johnson lying beside the road at approximately mile nine Old Richardson Highway, near Fairbanks. Johnson had been shot six times. At an autopsy performed later that day a .44 magnum caliber bullet and a .45 caliber bullet were removed from Johnson's body. Police investigating the murder scene discovered one expended .44 magnum caliber bullet in a willow branch near the body. Two other .44 magnum caliber bullets were discovered on the ground under Johnson's right hip, where they had apparently come to rest after exiting Johnson's body. That same morning police investigators were called to a construction yard about three miles from where Johnson's body was found. There they found the burning remains of a car which Mark Johnson had been driving the previous evening. The car had been parked by a chain link fence, doused with kerosene, and set on fire.

Police had no luck in their investigation of the murder until November 3, 1976. That day investigator C. Roger McCoy was visited by George Redhead. Redhead spoke to McCoy about a conversation he had had with Michael Carman the previous evening in which Carman had told him about the Johnson murder. McCoy took notes of the conversation and later had them transcribed. The following account is based on the transcribed notes.

Carman told Redhead that he had met Johnson at the Hillside Club early on the morning of October 22, 1976. Johnson had approached Carman and offered to sell him some cocaine. Carman said he was interested, but explained he would have to return to the trailer where he was living to get money. Carman and Johnson drove to the trailer where Carman and another person who evidently lived in the trailer armed themselves with .44 magnum and .45 automatic handguns. They then drove with Johnson out to the Old Richardson Highway. Carman's accomplice pulled out his gun and told Johnson to get out of the car. Johnson did so, and then the accomplice opened fire. Carman then started firing as well. The two then drove the car away, parked it near a chain link fence, and set fire to it with kerosene.

Certain details of the incident—that .44 magnum and .45 caliber guns had been used, and that the car had been parked by a chain link fence and burned with kerosene—had not been made public when Redhead gave his statement, and the story therefore had the ring of truth. Carman was arrested and an arrest warrant was subsequently issued for Carman's accomplice, Anthony Boyd.

At trial, in addition to the testimony of Redhead, the state called James Drum, who had been living at the trailer with Carman at the time of the incident. Drum testified that Carman and Johnson arrived at the trailer early on the morning of October 22, 1976. Johnson was interested in selling cocaine. Anthony Boyd entered the room and said that he was interested in buying an ounce of cocaine, more than Johnson had with him. Drum testified that Boyd and Carman went into a back room for a moment. When they returned, Carman asked Drum for Drum's .45 caliber pistol. Drum gave it to him out of Johnson's sight. Johnson, Carman, and Boyd then left the trailer, ostensibly to get more cocaine. Boyd was carrying a green army bag in which Drum knew Boyd kept a .44 magnum revolver.

Drum testified that when Boyd and Carman returned to the trailer later that morning, Carman announced that they had killed Johnson, and handed back Drum's .45. The .45 had been fully loaded when Carman left. There was only one bullet remaining, jammed in the chamber. Drum then accompanied Boyd and Carman and helped them set Johnson's car on fire.

Kenneth Johnson testified that he was a friend of Carman's and that they were roommates in November, 1976. He testified that Carman had told him that he had shot Mark Johnson for his cocaine, using a .45 automatic.

In his defense, Carman testified that he had taken Mark Johnson to his trailer, and that Boyd had offered to buy an ounce of cocaine. He maintained that Boyd had

asked Carman to bring along the .45 automatic for protection against Johnson. It was Carman's testimony that Boyd was sitting next to Johnson in the front seat, and that when Boyd pulled the pistol on Johnson, Carman, in the back seat, was shocked. Boyd instructed Johnson to stop the car and get out. As Johnson stepped out Boyd opened fire. Carman remained seated in the back seat. After firing twice Boyd asked Carman for the .45 automatic. Carman gave it to him and at Boyd's instruction, he climbed into the driver's seat. Boyd fired the .44 magnum a third time and Carman drove away at a high rate of speed. It was Carman's testimony that at the Bradway Road exit Boyd told him to turn around and go back to make sure Johnson was dead. At the scene, Boyd got out and fired three rapid shots from the .45 automatic. The pistol jammed. Boyd unjammed the gun and then fired three or four more rapid shots. Carman and Boyd then drove back to the trailer, picked up Drum, and disposed of the car.

A Mr. Knowles, who lived in a mobile home near the murder scene, testified that at approximately 6:30 that morning he had heard two loud shots, then a third shot, and then three more shots, all within a period of less than a minute. He heard no other shots that morning. On rebuttal, an investigator with the state troopers testified that after Carman gave his testimony the investigator had followed the route described by Carman—from the murder scene to the Bradway Road Exit and back to the scene— at the speeds to which Carman had testified. It had taken the investigator four minutes and fifty seconds to cover the 3.6 mile route. When considered with Knowles' testimony that the shots occurred within a period of less than a minute, this contradicted Carman's story.

The jury found Carman guilty. He was sentenced to life imprisonment for murder and fifteen years for armed robbery, to be served concurrently.[1]

## II

Carman's motion for a new trial was based in part on newly discovered evidence in the form of the testimony of Anthony Boyd. Boyd fled the state after the murder. He was apprehended and returned to Alaska shortly before Carman's trial. Carman's trial counsel attempted to get a statement from Boyd, but he refused to give one and refused to testify at Carman's trial. Boyd pled *nolo contendere* to crimes involved in the present case. At that time he stated that he had no recollection of the murder. However, a few weeks later, before he was sentenced, he testified on Carman's behalf that he had fired both guns, that Carman had not fired, that there had been no prior plan to rob Johnson, and that he had threatened to kill Carman if he talked. His testimony was thus corroborative of Carman's version of the murder. The trial judge indicated that he did not believe Boyd's testimony and referred specifically to its inconsistency with Knowles' testimony to the effect that all shots were fired within a period of less than a minute.

Another part of the motion for new trial dealt with the failure of the prosecutor to disclose certain items of information pertaining to George Redhead. After the trial defense counsel learned that an anonymous donor had established a reward fund to be distributed to the person or persons who contributed most significantly to the arrest and conviction of Mark Johnson's murderers. The reward would be paid following conviction. The recipients would be determined by a panel which consisted of Investigator McCoy, the district attorney, and the donor. The donor had discussed with McCoy setting up the reward several days before Redhead gave his statement, but Redhead did not know of the reward when he first came to McCoy. According to Redhead, he was told of the reward and that he would be considered as a potential recipient on the day that he approached McCoy, after their initial conversation; according to McCoy he told Redhead of his potential eligibility for a reward a few days after the

---

1. The life sentence was later reduced to thirty years.

initial meeting. After the trial Redhead was paid the sum of $1,500 from the reward fund.

Shortly before Redhead approached McCoy he had been convicted for possession of marijuana, and fined $75.00. He was on probation for a heroin conviction at the time. When Redhead first went to the police he asked McCoy to give him money to pay the fine. McCoy refused, but after Redhead agreed to try to find out more from Carman, he was given a total of $136.00 for expenses ostensibly to be incurred in carrying out this investigation. Neither the fact that Redhead had requested money to pay his fine nor that he was paid money to investigate Carman was disclosed to Carman's attorney.

At closing argument the prosecutor stressed that Redhead had no motive to lie.

### III

 The only newly discovered evidence which will justify a new trial is that which "on a new trial, would probably produce an acquittal." *Rank v. State,* 382 P.2d 760, 761 (Alaska 1963) (*quoting Salinas v. State,* 373 P.2d 512, 515 (Alaska 1962)). There is a similar standard by which evidence not disclosed by a prosecutor is to be judged, when, as here, there is only a general request for exculpatory material. In such cases

> [I]f the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been commit-

ted. This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt.

*United States v. Agurs,* 427 U.S. 97, 112–113, 96 S.Ct. 2392, 2402, 49 L.Ed.2d 342, 355 (1976).[2] (Footnote omitted).

Since the newly discovered evidence and the federal non-disclosure standards are similar, there is no logical difficulty in evaluating together the impact which the newly discovered and undisclosed evidence might have in a new trial. We do so here, mindful of the fact that the overriding concern reflected by these standards is "the justice of the finding of guilt." *United States v. Agurs,* 427 U.S. at 112, 96 S.Ct. at 2401, 49 L.Ed.2d at 354 (footnote omitted).

The situation in which one party to a crime shoulders full responsibility for it after another has been tried and convicted is not particularly rare. Generally speaking the new testimony is regarded with some skepticism, especially where the witness has either something to gain or nothing to lose by his testimony. *United States v. Jacobs,* 475 F.2d 270, 286 n. 33 (2nd Cir.), *cert. denied,* 414 U.S. 821, 94 S.Ct. 116, 38 L.Ed.2d 53 (1973); *United States v. La Duca,* 447 F.Supp. 779, 782 (D.N.J.1978),

---

**2.** In *Nicholson v. State,* 570 P.2d 1058, 1063 n.21 (Alaska 1977) we reserved the question whether the state standard was less strict than that expressed in *Agurs.* It is unnecessary to decide this point here in view of our conclusion that the federal standard has been met. However, as we noted in *Nicholson* our Criminal Rule 16(b)(3) imposes an affirmative duty to disclose exculpatory material to the defense and violations of that rule will be judged under the test we articulated in *Love v. State,* 457 P.2d 622, 630 (Alaska 1969).

> The pivotal question is what the error might have meant to the jury. Our function is to consider not how the error would have affected us if we had tried the case, but how it may have affected a jury of reasonable laymen. . . .

. . . The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.

457 P.2d at 630–31 *quoting Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557, 1567 (1945). It seems quite unlikely that any prosecutorial non-disclosure might violate the constitution, but not Criminal Rule 16, and thus whether we adopt the *Agurs* standard is probably only of academic interest since the *Love* standard is less demanding.

*cert. denied*, 440 U.S. 972, 99 S.Ct. 1537, 59 L.Ed.2d 789 (1979); *State v. O'Clair*, 292 A.2d 186, 197 (Me.1972); *Commonwealth v. Treftz*, 465 Pa. 614, 351 A.2d 265, 273 (1976). That, however, is not the situation presented here. Boyd was awaiting sentencing at the time he gave his testimony magnifying his own guilt and exonerating Carman. It would seem natural that he would be concerned with the effect his statement might have on his sentence. That concern has elsewhere been regarded as "a potent guarantee of trustworthiness." *La Duca*, 447 F.Supp. at 783.

We think the question of whether the trial judge abused his discretion in refusing to grant a new trial in view of Boyd's testimony is a close one. Supportive of the conclusion that Boyd's testimony probably would make no difference is the fact that he stated when he pled *nolo contendere* in his own case that he remembered no details of the murder. Further, his current testimony is sketchy as to many of the details of the crime. On the other hand, he has no obvious motive to fabricate and, in view of his pending sentencing, his story would appear to be against his interest. Moreover, the trial court's reliance on Knowles' testimony as proof that Boyd's, and Carman's, testimony was false cannot be given great weight. Two other witnesses living with Knowles gave statements to the police which indicated that there were two groups of shots. These witnesses did not testify at the trial. According to one witness, the shots were two or three minutes apart, with the first group of shots sounding louder than the second group, which in turn he described as "sharper." The other witness was not asked in his original statement to estimate the time interval separating the shot groups. He subsequently stated that it was "probably anywhere from two to four minutes." This evidence is supportive of the Boyd-Carman version of events.

Turning to the question of nondisclosure of the circumstances under which Redhead gave his statement and his testimony, the state did not fulfill its responsibility to disclose to defense counsel the existence of a reward, the fact that Redhead had been told early on that he was a potential recipient of it, the fact that Redhead had requested money when he first approached the police, and the fact that Redhead was paid money after he gave the initial statement. The due process clauses of the federal and state constitutions[3] require that a prosecutor disclose information reasonably bearing on the credibility and bias of witnesses.[4] Alaska Rule of Criminal Procedure 16(b)(3) imposes the same duty. *Braham v. State*, 571 P.2d 631, 641–45 (Alaska 1977), *cert. denied*, 436 U.S. 910, 98 S.Ct. 2246, 56 L.Ed.2d 410 (1978). As we stated in *Braham, id.* at 645 (citations omitted):

> [W]e have consistently held that it is essential to a defendant's right to a fair trial that he be allowed every opportunity to show bias on the part of a witness testifying against him. If [defense] counsel was unduly limited in his right of cross-examination to show bias on [the witnesses] part by the failure of the state to produce the . . . material referred to, then there must be a reversal and a new trial.

In this case had there been an appropriate disclosure defense counsel could have elicited testimony which might be taken as showing that Redhead, who needed money to pay a fine, exaggerated the story he received from Carman to make his information appear more valuable to police investigators. It is, of course, clear from the unpublicized details Redhead knew about that he had talked to Carman, and the fact that a reward existed could not have motivated him to approach the police in the first place because he did not then know about it. However, an important discrepancy between Redhead's story, as reflected in the

---

**3.** Alaska Const. art. I, § 7, and U.S.Const. amend. XIV.

**4.** *See e. g. Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104, 108 (1972); *United States v. Joseph*, 533 F.2d 282, 286 (5th Cir. 1976).

transcribed notes of Officer McCoy, as initially given and his trial testimony is that in his trial testimony he stated that Carman had told him that they had intended to "burn" Johnson from the start. This is missing from the statement written up by McCoy. This discrepancy is a major one since the addition, if that is what it is, can be read as supplying elements of intent and premeditation essential for the robbery and first degree murder convictions. If an adequate disclosure had been made to defense counsel, evidence supporting the obvious argument that Redhead was building a case against Carman in order to receive a reward after conviction could have been developed.

The prosecuting attorney compounded the harm by stating in his final argument to the jury that Redhead "has no involvement in this whatsoever . . . ." "What motive does Mr. Redhead have to lie? None." In making this argument the prosecutor was taking advantage of his failure to comply with his disclosure duty. We regard this as fundamentally unfair.

■ We view the case as presented at trial as a close one. The testimony of the other witnesses to whom Carman had allegedly made admissions, Kenneth Johnson and James Drum, was not compelling.[5] In a new trial, with corroboration of Carman's story by Boyd, and Redhead's testimony cast in a different light, in our opinion it is more likely than not that the scales will tip and a reasonable doubt will be found. That, of course, will be for the jury to determine.[6]

The judgment is reversed and the case is remanded for a new trial.

CONNOR, J., not participating.

BURKE, Justice, concurring.

I would base the reversal in this case solely on the prosecutor's failure to disclose information that bore directly on the credibility and possible bias of the witness George Redhead, and his patently false suggestion to the jury, in final argument, that Redhead had no motive to fabricate. Such conduct, in my opinion, violated not only the disclosure provisions of law cited by the majority, but also the Code of Professional Responsibility. Disciplinary Rule 7–102 provides in part: "(A) In his representation of a client, a lawyer shall not: . . . (3) Conceal or knowingly fail to disclose that which he is required by law to reveal . . . [or] (5) Knowingly make a false statement of law or fact." Since I cannot say, with fair assurance, that the jury was not substantially swayed by the prosecutor's action, I think that action alone requires reversal of Carman's conviction. *Love v. State*, 457 P.2d 622 (Alaska 1969).

**5.** Both Drum and Kenneth Johnson were admitted sellers of illegal drugs. It was brought out in cross-examination that Drum had told several conflicting stories of the events surrounding Mark Johnson's murder. Kenneth Johnson testified that Mike Carman was the type of person who would often give untrue

accounts of his participation in events in order to attempt to impress his friends that he was a "tough guy."

**6.** In view of our holding, it is unnecessary to discuss the other points raised on appeal.