Dennis J. HATFIELD, Appellant,

v.

STATE of Alaska, Appellee.

Larry EVANS, Appellant,

v.

STATE of Alaska, Appellee.

Nos. 6371, 6732.

Court of Appeals of Alaska.

May 27, 1983.

Joel H. Bolger, Asst. Public Defender, Barrow, and Dana Fabe, Public Defender, Anchorage, for appellant Hatfield.

John A. Scukanec, Asst. Atty. Gen., Anchorage, and Wilson L. Condon, Atty. Gen., Juneau, for appellee in No. 6371.

Kurt M. LeDoux, LeDoux & LeDoux, Kodiak, for appellant Evans.

Kristen Young, Asst. Atty. Gen., Anchorage, and Norman C. Gorsuch, Atty. Gen., Juneau, for appellee in No. 6732.

Before BRYNER, C.J., and COATS and SINGLETON, JJ.

## OPINION

BRYNER, Chief Judge.

Dennis Hatfield and Larry Evans were convicted in separate trials of theft in the second degree, AS 11.46.130(a)(1). They appeal, contending that the state's failure to preserve scrap copper, which was the object of their theft, deprived them each of a fair trial. We agree and reverse.

On the evening of November 14, 1980, William Hartman called the Kodiak police and reported the theft of two fifty gallon drums from the yard of his shop. The drums were full of scrap copper Hartman had collected over the past eight or nine years. The next morning Hartman went to his shop, where he noticed hand cart tracks leading from his lot to the lot next door. He followed the tracks and found his two barrels of scrap copper. After notifying the police that he had found the barrels, he sat at his window watching the lot next door. About one-and-one-half hours later a truck pulled up, and two men started pulling copper out of the barrels and throwing it into the back of the truck.

Kodiak Police Officer Alvie Dunnagan responded to Hartman's second call. When Dunnagan arrived on the scene, the two men who had been loading copper into the truck fled on foot. The men were later apprehended nearby.

Officer Dunnagan approached two females who were sitting in the cab of the truck. The driver, Ellen Valley, explained that Larry Evans and Dennis Hatfield had asked to borrow her pickup truck to haul some trash. She offered to drive them instead; they accepted, and she drove them to this area. Valley essentially confirmed that Evans and Hatfield had been loading the copper into the truck and that they had run away when the police car drove up.

Officer Dunnagan photographed the copper in the truck and the barrels next to it, and then released the copper to Hartman. Valley drove her pickup to Hartman's shop, where Hartman pulled the copper out of the truck and threw it on the ground. Some time later, Hartman's nephew repacked the barrels. In early December, 1980, Hartman's wife shipped the copper to Seattle for sale.

On December 17, 1980, Hatfield and Evans were indicted for second-degree theft. The indictment alleged that the two barrels of scrap copper each weighed approximately 1,000 pounds and had a total value of more than $500.

Evans requested production of the barrels of copper on March 26, 1981. The state responded that it was uncertain whether the barrels were in existence, but an effort to find out would be made; in the interim, the photographs taken by Officer Dunnagan were provided. On April 28, 1981, Evans and Hatfield moved to suppress any evidence concerning the copper, or in the alternative, for dismissal, on the grounds that the state had failed to preserve the copper itself. The memorandum in support of the motion stated that the copper was needed in order to challenge at trial the estimates made by Hartman regarding the weight and value of the copper.

An evidentiary hearing was held on May 4, 1981. Hartman testified that his estimate of the weight of the two barrels was just a guess, but that he had packed them

and put the lids on before they were stolen. Evans and Hatfield had ripped the lids off and tossed some of the contents of the barrels into the truck. When Ms. Valley backed her pickup truck onto Hartman's lot, Hartman had thrown the loose copper onto the ground. Officer Dunnagan was present, and told Hartman he could sell the copper if he wished. Hartman produced receipts from a scrap buyer in Seattle; they detailed the weights and various grades of copper received from Hartman, the price paid for each grade, and the total amount paid after freight charges were deducted, $1,335.36.[1] When asked if any copper other than that which was originally in the barrels was added during repacking or before shipping, Hartman replied "No, just the original stuff that was taken out."

Officer Dunnagan also testified at the evidentiary hearing. He stated that inasmuch as the copper was clearly Hartman's, and there was no place for the police to store it, photographs seemed the most appropriate means of retaining evidence of the crime. Dunnagan admitted that he did not tell Hartman to hold the copper for evidence. Judge Madsen denied the motion to suppress or dismiss, apparently on the grounds that the copper lost was clearly in excess of the amount necessary for the offense, $500.[2]

On June 29, 1981, Evans and Hatfield filed a second motion to suppress the evidence or dismiss the charges, based on recent discovery of several additional facts relating to the copper. Evans' counsel alleged by way of affidavit that representatives of the scrap metal company in Seattle indicated that in fact four barrels of copper, rather than two, were shipped by Hartman and his wife, that the invoices covered the contents of all four barrels, and other facts that conflicted with Hartman's testimony.

These motions were apparently denied without a new hearing. However, Evans and Hatfield were each, at their separate trials, allowed to cross-examine prosecution witnesses fully and to present their own witnesses on the issue of value, which was the only element disputed at either trial. The testimony of a freight handler and a scrap metal dealer bore out the allegations that had been made by Evans' counsel in the second suppression motion. The handler testified that he received four barrels from Mrs. Hartman, in Kodiak, and that two of the barrels seemed heavier than the other two, although the barrels were not weighed individually. The scrap dealer testified that he made out the invoices that were discussed at the evidentiary hearing and that they did indeed relate to all four barrels. He also stated that, based upon many years' experience with scrap copper, the average weight of a barrel was in the range of 500 pounds; barrels of scrap copper weighing 1,000 pounds could probably be obtained if some sort of machinery was used to pack the copper.

William Hartman's trial testimony was essentially in accord with his testimony before the grand jury and at the evidentiary hearing, except that he admitted there were four barrels shipped and stated that his nephew, Willie Hartman, had repacked them at Hartman's direction. Although impeached with prior testimony that was

1. The contents of the invoices can be summarized as follows:

| | | |
|---|---|---|
| 606 lbs. of #1 copper @ $.75/lb.: | $ | 454.60 |
| 1,110 lbs. of #2 copper @ $.65/lb.: | | 721.50 |
| 174 lbs. of #2 copper (not completely burned) @ $.60/lb.: | | 104.40 |
| 218 lbs. of #3 copper @ $.62/lb.: | | 135.16 |
| 56 lbs. of copper ash @ $.05/lb.: | | 2.80 |
| 253 lbs. of bronze cable @ $.60/lb.: | | 151.80 |
| 2,417 lbs. | Total: | $ 1,570.26 |
| | - Freight: | 234.90 |
| | Net: | $ 1,335.36 |

2. Due to malfunction of the recording device, only Hartman's testimony was preserved from the evidentiary hearing. The summary of Dunnagan's testimony and the basis of the court's holding are taken from the log notes. A later motion filed by Evans and Hatfield summarized the court's holding as follows:

This court . . . held, *inter alia,* that there was not a denial of due process by destroying the evidence because there were photographs of the barrels, and there was evidence as to how much the barrels weighed from the invoices; and it would be unreasonable to expect Mr. Hartman to store a ton of copper while awaiting trial.

arguably in conflict with the testimony offered at trial, Hartman insisted that over 90% of the copper ultimately shipped was in the two barrels originally stolen.

Hartman's nephew, Willie Hartman, also testified. He stated that his uncle asked him to pack some copper into barrels, but did not tell him any of it had been stolen. He started with two barrels that had copper in them already.[3] One of the two had a rusted bottom. Hartman tried to lift the other one onto his uncle's truck, but found he was unable to do so, so he emptied part of it onto the ground and placed this barrel on the truck, apparently with three empty barrels. He put the copper he had just dumped out back into the first barrel, then added the copper from the second barrel, the one with the rusted bottom. After packing this copper down with a heavy steel rod, Willie Hartman was able to add even more copper, which he found strewn about the yard in front of his uncle's shop. With this copper, some of which was scattered about the yard and some of which was in boxes or crates, he also filled the remaining three barrels. He packed all four as tightly as he could, then sealed them.

Evans and Hatfield each moved unsuccessfully for a judgment of acquittal on the grounds that there was insufficient evidence that the copper stolen was worth more than $500 as charged in the indictment. Both were found guilty.

On appeal, Evans and Hatfield contend that the copper allegedly stolen should have been retained and that the failure to do so violated their right to due process. *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *Lauderdale v. State,* 548 P.2d 376 (Alaska 1976). The state argues that its duty to preserve evidence extends only to items that reasonably appear to be material evidence in a given case, citing *Nicholson v. State,* 570 P.2d 1058 (Alaska 1977). Even accepting this standard,[4] we conclude that Officer Dunnagan should have realized that the weight of the copper was material to the offense here. It is difficult to imagine evidence more material to the charge of theft than the property stolen, especially when the nature of the stolen property precludes a ready determination of its value by reference to other, similar property. The state's reliance on *Nicholson v. State* is thus inappropriate. In *Nicholson,* police officers had no indication of the relevance of the items at the time of their investigation. *Id.* at 1064. Here, the fact that the value of the copper might be a crucial factor should have been apparent from the outset, and thus the copper should have been retained by the police, safeguarded from commingling, or at the very least accurately graded and weighed.[5]

---

**3.** In Evans' trial, Willie Hartman stated that there was one full barrel and one half-full barrel when he started, but that he beat the full one down until it too was only half full. In Hatfield's trial, Hartman stated that he began with one barrel which was half full and one which was a little less than half full.

**4.** The Alaska Supreme Court has rejected the argument that the good faith of a police officer should justify destruction of material evidence. *Williams v. State,* 629 P.2d 54, 64 n. 22 (Alaska 1981); *White v. State,* 577 P.2d 1056, 1060 n. 14 (Alaska 1978); *Lauderdale v. State,* 548 P.2d at 381–82.

**5.** We further note that, at the time of this offense, former AS 12.35.080 expressly required preservation of the property. This section provided:

When property alleged to have been stolen or embezzled comes into the custody of a judge, magistrate or peace officer, he shall hold it subject to the order of the judge or magis-

trate who examines the charge against the person accused of stealing or embezzling the property.

Only after the charges had been examined could the property have legally been released to its owner. See former AS 12.35.090.

Former AS 12.35.080 was repealed effective January 1, 1983. It was replaced by AS 12.80.-050, which provides:

*Photographic evidence of property wrongfully taken or damaged.* (a) In a criminal proceeding or a children's court proceeding involving the wrongful taking or damaging of property, photographs of the property are competent evidence of the property and are admissible in the proceeding to the same extent as if the property had been introduced as evidence.

(b) Photographs of property that are to be introduced as evidence under this section shall be accompanied by a written description of the property, the name of the owner of the property, the location where the al-

However, not every failure to preserve evidence violates one's constitutional right to due process. Rather, the unavailability of evidence violates due process only if the evidence "might have led the jury to entertain a reasonable doubt about the defendant's guilt." *Williams v. State*, 629 P.2d 54, 64 (Alaska 1981). *See also Wyrick v. State*, 590 P.2d 46, 46 n. 1 (Alaska 1979). The state argues that the availability of the copper would not have raised a reasonable doubt as to the guilt of either Evans or Hatfield. This assertion is based primarily on the testimony of William Hartman that the bulk of the copper ultimately shipped was the stolen copper and on the invoices introduced into evidence indicating that the total value of copper shipped was over $1500. According to the state, the copper, if it had been retained, would only substantiate this overwhelming evidence of value.

This argument assumes too much. Given the entire record in this case, particularly the testimony of Willie Hartman, it is possible that the copper stolen comprised less than one-third of the copper sold, by weight.[6] The record as a whole leaves open the distinct possibility that, had they been given the opportunity to sort and value the stolen copper according to weight and grade, Evans and Hatfield might have been able to raise a reasonable doubt that its worth was over $500. *Williams v. State*, 629 P.2d at 64. The state has done nothing to explain discrepancies between the testimony of William Hartman and his nephew, Willie, concerning what percentage of the copper shipped for sale to Seattle was made up of the copper stolen by Evans and Hat-

field. Nor did the state make any effort to clarify or discredit Willie Hartman's testimony; in fact, according to William Hartman's own testimony, his nephew was in the best position to know what portion of the Seattle shipment was made up of the stolen copper. "[T]he heavy burdens of establishing that the failure to preserve the evidence occurred in good faith and not out of a desire to suppress evidence and of demonstrating that the defendant has suffered no resulting prejudice rest squarely on the shoulders of the state." *Putnam v. State*, 629 P.2d 35, 44 n. 18 (Alaska 1981). Here, we cannot find that the state had met these burdens.

Accordingly, the convictions for second-degree theft must be reversed. Because neither Hatfield nor Evans contends that the stolen copper could, under any plausible theory, have been worth less than fifty dollars, the convictions need not be vacated in their entirety. Rather, the court below should enter convictions for theft in the third degree, AS 11.46.140(a)(1), as to both defendants. *See Nix v. State*, 624 P.2d 823, 824–25 (Alaska App.1981).

The convictions are REVERSED and this case is REMANDED for proceedings consistent with this opinion.

leged crime occurred, the name of the investigating peace officer, the date the photograph was taken, and the name and signature of the photographer. The written description shall be signed by the investigating peace officer under penalty of perjury under AS 09.63.020. Even under the broader terms of the new statute, it is questionable whether sufficient steps were taken to preserve evidence of the stolen property. Although photographs were taken, it is arguable that, in the absence of an accurate

determination of weight, any written description of the stolen property would not comply with the requirements of AS 12.80.050(b).

**6.** We recognize that some of the loose copper Willie Hartman gathered from the yard was probably stolen, in that it was placed there by William Hartman directly from Ellen Valley's pickup truck after the theft. However, we are not convinced from the record as a whole that this loose copper was a substantial amount.